ALFRED D. CHANDLER, JR., & others[1] *vs.* COUNTY
COMMISSIONERS OF NANTUCKET COUNTY.

Barnstable. April 2, 2002. - August 7, 2002.

Present (Sitting at Barnstable): MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, &
CORDY, JJ.

*Eminent Domain,* Validity of taking, Purpose of taking, Authority for taking.
*County,* Commissioners. *Way,* Public: establishment, Public: what
constitutes. *Beach. Real Property,* Beach.

Discussion of the standard of review in a certiorari case. [434]

Because G. L. c. 82 authorizes takings solely to facilitate safe and convenient
travel through the construction of roadways or the improvement or repair
of existing roadways, the action of the defendant county commissioners in
taking land in effect to acquire portions of a beach for public use, and to
prevent the owners of the land contiguous to that beach from inhibiting the
public from traversing their land, was invalid, where the county commis-
sioners expressly disavowed any intention of building a highway. [435-442]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on March 23, 2000.

On transfer to the Superior Court Department, the case was
heard by *Gary A. Nickerson,* J., on a motion for judgment on
the pleadings.

The Supreme Judicial Court granted an application for direct
appellate review.

*Howard P. Blatchford, Jr. (Andrew J. Ley* with him) for the
plaintiffs.

*Kimberly M. Saillant* for the defendant.

*Michael E. Malamut,* for New England Legal Foundation,
amicus curiae, submitted a brief.

MARSHALL, C.J. At issue in this appeal is the validity of several
takings of land in the Surfside area on the southern coast of
Nantucket. The county commissioners of Nantucket County

---

[1]Nineteen other landowners in Nantucket and The Surfside Association.

(commissioners) took the property in fee simple pursuant to G. L. c. 82. That statute grants the commissioners the authority to take land "necessary, for the purpose of laying out, altering or relocating a highway." G. L. c. 82, § 7. At public hearings related to the takings the commissioners stressed that they had "no plan to do anything" with the taken land; they sought only to "preserv[e] historic rights [of way] to the sea" and to "manage these . . . beautiful assets." The plaintiffs, landowners in Surfside whose property was taken, claim that the true purpose of the takings was to establish access rights to the beach over their land. This purpose, they argue, cannot support takings pursuant to G. L. c. 82.

We must decide whether the takings exceeded the proper scope of the commissioners' power under G. L. c. 82. In so doing, we need not decide whether land taken in order to connect an existing public way to the ocean may qualify as a taking under G. L. c. 82, for in this case the commissioners expressly disavowed any intention to build (or even improve) any roadway. Indeed a good part of the taken land lies on beach sand at the edge of the surf. We face a narrower issue: whether land may be taken under G. L. c. 82 in effect to acquire beach areas for public use, and to prevent the owners of the land contiguous to that beach from inhibiting the public from traversing their land, where the taking authority has expressly disavowed any intention of building a highway. It may not. Accordingly, we reverse the judgment of the Superior Court dismissing the complaint and vacate the takings ordered by the commissioners.

1. *Citizens' petition and public hearings.* On September 21, 1998, sixteen citizens of Nantucket submitted a petition to the commissioners, asking that they lay out for highway purposes and acquire by eminent domain the fee simple title to certain land in the Surfside area of the island. G. L. c. 82, § 2.[2] On December 8, 1999, the commissioners held a public hearing

___

[2]The commissioners may be petitioned to exercise their powers "[i]f common convenience and necessity require a new highway from town to town or from place to place within the same town, or the alteration, specific repair or discontinuance of an existing highway." G. L. c. 82, § 2.

regarding the proposed takings. G. L. c. 82, § 4.[3] The proposed takings plan discussed at this meeting was based on ways, privately owned, many no more than 200 feet apart, shown on an old subdivision grid plan recorded in 1889 with the Nantucket County registry of deeds. Most of the ways marked on the plan were never laid out, improved, used, or dedicated as streets. Due to substantial erosion of the shoreline over the past one hundred and more years, several of the ways are now partially or completely under water, and many parts of the plan are on what is now beach sand. Several of the landowners objected. The objections necessitated a second public hearing, held on January 26, 2000, regarding "the manner in which the proposed improvement shall be carried out." G. L. c. 82, § 5. See note 3, *supra.*

. Between the first and second hearings, the commissioners revised the proposed takings plan to exclude the land that is now submerged under water. See *Marblehead* v. *County Comm'rs of Essex,* 5 Gray 451, 452 (1855) (commissioners have no authority to lay out highways over navigable waters or on land below high water mark). At the second hearing, proponents of the measure read into the record a letter to the commissioners from the Nantucket planning and economic development commission (NPDC) concerning the proposed takings, in which it gave "its strong support for the efforts . . . to acquire rights of way to shoreline access in the Surfside area." The proposed takings, it continued, were consistent with the NPDC's identification of such rights of way "as among the highest open space acquisition priorities," and furthered its "goal of acquiring twenty five percent of the shoreline by the year 2025." In opposition, the affected landowners questioned the lack of conservation plans for the taken land and the legality of the takings under G. L. c. 82.

---

[3]The commissioners "shall hear the parties [and] determine whether [the highway petitioned for] is required by the common convenience and necessity." G. L. c. 82, § 4. On an affirmative finding, assuming no interested person objects, the commissioners may "lay out, order specific repairs upon or alter such highway without further notice." G. L. c. 82, § 5. An objection by an interested person necessitates a second hearing "at which any party interested may be heard with respect to the manner in which the proposed improvement shall be carried out." *Id.*

In response to questions from the landowners, the commissioners repeatedly stressed that they had "no plan to do anything" with the land: "There is no master plan to change anything" in Surfside. "There is only the need for us to ensure that generation upon generation upon generation can use the roadways and the rights of way to the ocean without landowners blocking them off." "Tomorrow morning," they asserted, "we're not going to be out there paving. Or next year at this time or — for a long time." The commissioners asserted they would be "preserving historic rights [of way] to the sea." They noted that, although the current landowners had been "willing" to allow people to access the beach, the commissioners were concerned that future owners might not be: "[W]e need to make sure that if we're going to manage these assets, these beautiful assets, that . . . we're in a good position to do that." They also claimed that parking could be better controlled if the ways were publicly owned. And there were "some elderly folks living down there" that would benefit by "access" of a fire engine or an ambulance "back and forth." Their reasons set forth, the commissioners noted that the takings needed to be in "common convenience and necessity" under G. L. c. 82, § 2, and then voted and read into the record the orders of takings.

After the vote, a Nantucket resident placed an article on the Nantucket town meeting warrant "to repeal, amend, or veto" the takings, or, in the alternative, to "enact takings in the Surfside area pursuant to a beach access management plan to be formulated in conjunction with Surfside residents and Massachusetts Coastal Zone Management." The article failed to achieve a two-thirds majority vote needed to pass. See § 2.8(d) of the Nantucket County Charter, St. 1996, c. 290, § 4.

2. *The takings.* The taken land comprises fourteen forty-foot wide strips of land ranging in length from roughly 250 to 2,200 feet, and lies within a relatively unpopulated one half-mile area of beach and beach front property, one-half mile east of the existing beach. Twelve strips run perpendicular to the ocean at approximately 200-foot intervals. Of these, eleven are laid out partly on beach sand, terminating in the surf. Two of the proposed strips (Nobadeer and Weweeder) parallel the shoreline; one (Nonantum) lies entirely on the sand. The plaintiffs claim,

and the commissioners do not dispute, that roughly one-third to one-half of the total area of the land taken is laid out on beach sand seaward of a clearly delineated coastal bank, subject to the ebb and flow of the tide; the revised takings plan shows takings of roughly two acres of coastal beach.

3. *Court proceedings.* The plaintiffs sought relief in the nature of certiorari in the Supreme Judicial Court for the county of Suffolk. See G. L. c. 249, § 4. They requested an injunction barring the commissioners from recording or registering any order of taking in accordance with their vote of January 26, 2000, a declaration that the commissioners' action was not a valid exercise of authority under G. L. c. 82, and a judgment quashing that action. A single justice transferred the case to the Superior Court, where the parties filed the administrative record of the proceedings before the commissioners. See Superior Court Standing Order 1-96(2). The plaintiffs moved for judgment on the pleadings, which the judge denied after a hearing, dismissing the complaint. We granted the plaintiffs' application for direct appellate review.

4. *Standard of review.* The standard of review in a certiorari case may vary according to the nature of the action for which review is sought. See *Levy* v. *Acting Governor*, 436 Mass. 736, 745-746 (2002); *McSweeney* v. *Town Manager of Lexington*, 379 Mass. 794, 800 (1980). Commissioners have long exercised broad discretion in determining whether a new highway is warranted. See *Monterey* v. *County Comm'rs of Berkshire*, 7 Cush. 394, 402 (1851). Certiorari review of such discretionary action is generally not available except to determine whether the action was arbitrary and capricious. See, e.g., *Emerson College* v. *Boston*, 391 Mass. 415, 422 n.14 (1984); *School Comm. of Hatfield* v. *Board of Educ.*, 372 Mass. 513, 517 (1977); *First Church of Christ, Scientist* v. *Alcoholic Beverages Control Comm'n*, 349 Mass. 273, 275 (1965). In the context of the plaintiffs' claim, this is saying no more than that we examine the commissioners' actions to determine whether they have acted for reasons extraneous to G. L. c. 82. See *Fafard* v. *Conservation Comm'n of Reading*, 41 Mass. App. Ct. 565, 567-568 (1996) (applying arbitrary and capricious standard of review).

5. *Commissioners' authority under G. L. c. 82.* As the Superior Court judge noted, the record is replete with statements by the commissioners of their "intent to secure the land for present and future access to the beach and the ocean." General Laws c. 82 makes no reference to the propriety of a taking on that basis. We therefore consider whether the taking of land to secure for public use multiple pathways to the ocean at points only 200 feet apart, where there is no intent to construct roadways on the land taken, is consistent with the intent of the statute. Applying traditional rules of statutory construction, we conclude that the statute authorizes takings solely to facilitate safe and convenient travel through the construction of roadways or the improvement or repair of existing roadways. As the commissioners' objective was plainly not to construct or improve any roadway, we conclude that their action in this instance was invalid.

We interpret a statute "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language . . . to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Accord *Boston Police Patrolmen's Ass'n* v. *Boston*, 435 Mass. 718, 719-720 (2002). In this case the statutory language is not conclusive, but we may glean some insight from the statute's various provisions. We also turn to extrinsic sources, including the legislative history and other statutes, for assistance in our interpretation. See *EMC Corp.* v. *Commissioner of Revenue*, 433 Mass. 568, 570-571 & nn.6-8 (2001) (other statutes); *Barclay* v. *DeVeau*, 384 Mass. 676, 680 (1981) (legislative history).

General Laws c. 82, § 1, grants county commissioners the authority to "lay out, alter, relocate and discontinue highways and order specific repairs thereon." To this end, the commissioners are empowered to take by eminent domain the land "necessary" to exercise that authority, *id.* at § 7, and may do so where they determine that the "new highway . . . or the alteration, specific repair or discontinuance of an existing highway" "is required by the common convenience and necessity." *Id.* at §§ 2, 4. The determination that the "highway" is "required by the common convenience and necessity" is

central to the exercise of authority under the statute. We therefore consider its likely meaning.

A term appearing in different portions of a statute is to be given one consistent meaning. *Arnold* v. *Commissioner of Corps. & Taxation*, 327 Mass. 694, 700 (1951). The phrase "common convenience and necessity" appears three times in G. L. c. 82. In the first two instances, it is the yardstick by which to determine whether a new highway, alteration, or repair is "required." G. L. c. 82, §§ 2, 4. Section 32A, the third reference, provides additional context suggesting the manner in which such a requirement arises. That provision, governing the abandonment of municipal ways by city or town officers, states that the officers:

> "upon finding that a city or town way or public way has become abandoned and unused for ordinary travel and that *the common convenience and necessity no longer require said town way or public way to be maintained in a condition reasonably safe and convenient for travel,* shall declare that the city or town shall no longer be bound to keep such way or public way in repair" (emphasis added).

G. L. c. 82, § 32A. Here, the lodestar of "common convenience and necessity" is the need for public ways maintained in a state "reasonably safe and convenient for travel." Seeing nothing in §§ 2 or 4 to suggest a different meaning, we conclude that the inquiry into "common convenience and necessity" is to focus on whether the petitioned-for new highway, alteration, or repair is "required" to facilitate "reasonably safe and convenient . . . travel."[4]

In furtherance of safe and convenient travel, G. L. c. 82 contemplates that roadways will be constructed, altered, or repaired. Actions authorized by the statute include the laying out of a "new highway," and the alteration, relocation, or specific repair of an existing one. G. L. c. 82, §§ 1, 2, 3, 8, 10. Inherent in each of these is the physical alteration or construc-

---

[4]One other section speaks specifically in terms of travel. The commissioners are empowered, "[a]t the time of ordering specific repairs upon a highway, [to] direct it to be closed for public travel for a reasonable time." G. L. c. 82, § 10.

tion of roadways. Section 5 accordingly describes a new highway as a "proposed improvement."

Nine sections of c. 82 refer to the construction of roadways. G. L. c. 82, §§ 8, 9, 11A, 12, 14, 24, 25, 35, 38. For example, Section 11A permits the commissioners to enter private lands to make inspections "for the layout and construction of highways." Section 38 authorizes the purchase of land "from which may be taken materials necessary for the construction, repair or improvement of public ways." Section 12 permits the commissioners to allocate the "cost of construction" among the county or towns where the "highway" is located.

Other sections speak of the work to be performed. The commissioners must, "in their return . . . determine and specify the manner in which a new highway shall be laid out . . . and [must] specify in sufficient detail the work required so that the same may be completed in accordance with [their] directions, and the time within which it shall be completed." G. L. c. 82, § 8. They must "examine the work . . . during its progress to ascertain that it is well done." *Id.* On default of the "city or town whose duty it is to make such highway," the commissioners are authorized to complete it themselves. G. L. c. 82, § 14. See *Marcus* v. *County Comm'rs of Norfolk*, 344 Mass. 749, 750 (1962) (within commissioners' discretion to construct highways on failure of obligated town or city). Last, payment obligations for work done and damages incurred in the construction of the highway do not arise until the highway is "finally laid out" and "completed, in whole or in part." G. L. c. 82, §§ 12, 16.

Read as a whole, it is plain that G. L. c. 82 authorizes takings for a new highway only where the construction or physical improvement of a highway necessary for travel is contemplated. The commissioners' argument that under G. L. c. 82, "[p]avement is simply not required," misses the mark. What the statute contemplates is that land will be taken for the purpose of constructing highways. The manner of that construction is in the discretion of the commissioners, as informed (in cases of public objection to the takings) by a public hearing regarding "the manner in which the proposed improvement shall be carried out." G. L. c. 82, § 5. The mere taking of the land in its natural state, intending nothing more than to secure, in effect, a

public easement across it, does not qualify as a taking to construct or repair a "highway."

The legislative history of G. L. c. 82 lends further support to our reading of the law. See *Barclay* v. *DeVeau, supra* at 680. Few statutes in our Commonwealth can claim as extensive a heritage. The roots of G. L. c. 82 reach back in an unbroken line spanning over 360 years. At its genesis, as today, the statute's purpose is evident: to facilitate safe and convenient travel through the construction of roadways where these are necessary. The original statute, enacted in 1639, reflects this: *"To the end there may be convenient High-wayes for Travellers . . .* all Country Highwayes shall be such as may be most easie and safe for Travellers" (emphasis in original). General Laws of Massachusetts Colony, at 64 (1672), reprinted in Colonial Laws of Massachusetts 1672-1686 (1887). In "Common grounds, or where the Soyle is wet, myrie or very rocky," ways were to be laid out "the wider," indicating the statute's focus on safe and convenient travel. *Id.* Thus the Colony Laws of 1647 ensured clear roads by requiring the removal of any "incumbrance" on highways as "determined for ease and conveniency of Travellers." *Id.* at 65.

In the Province Laws of 1693, the highway statute took a more comprehensive form. St. 1693-1694, c. 23. The preamble restated the law's purpose: "For the better amending and keeping in repair and clear the highways and common roads, leading from town to town, and place to place." *Id.* Highways were, for the first time, to be laid out only if "judged to be of common necessity or conveniency," and the work was to be done "with most conveniency to the publick." *Id.* at § 2. All roads were to be "kept in repair," with failure occasioning liability for resulting injuries. *Id.* at §§ 1, 4.[5]

In 1825, the General Court repealed all prior highway statutes and enacted a new, but similar, law. St. 1825, c. 171, § 7. Its focus on the making of highways was manifest. The commissioners, imbued with the power "to order and determine upon the making, altering, turning or discontinuing" of highways, *id.*

---

[5]Liability for injuries caused by defects in public ways is now covered by G. L. c. 84. See, e.g., *Hawkes* v. *Metropolitan Transit Auth.*, 328 Mass. 140 (1951).

at § 3, also bore a "duty, to cause all roads located by them, to be constructed and finished to the acceptance of the said commissioners, in such manner as will best promote the public interest." *Id.* at § 4. See *Springfield* v. *Commissioners of Highways for the County of Hampden,* 4 Pick. 68 (1826). Two years later, the Legislature shifted the primary responsibility to make and complete highways to "towns [and] districts," only on whose default the commissioners "shall, as soon as may be, cause the [highways] to be completed." St. 1827, c. 77, § 7. The 1917 statute placed within the commissioners' discretion whether to "cause such highway to be completed" on the default of the obligated town. St. 1917, c. 344, pt. 2, § 32. See *Marcus* v. *County Comm'rs of Norfolk, supra* at 749. But the town remained — as it remains today — obligated to complete the way. G. L. c. 82, §§ 8, 14, 28.

Subsequent statutes carried forward the provisions of the 1825 statute with minor revisions.[6] Neither these changes, the recodifications in 1882 and 1902, nor the minor changes since have altered the statute's purpose. The legislative history is devoid of any concern with, or even consideration of, the commissioners' use of the statute to provide for public access to a beach, with no intent to construct any roadway.

More plausible statutory avenues are available to the commissioners to secure public access to the beach and ocean. See *Commonwealth* v. *Welosky,* 276 Mass. 398, 401-406 (1931), cert. denied, 284 U.S. 684 (1932) (looking to other statutes to guide interpretation). Accord *EMC Corp.* v. *Commissioner of Revenue,* 433 Mass. 568, 570-571 (2001). General Laws c. 34,

---

[6]Two amendments that do not survive in the current statute highlight that the law contemplates the construction of roadways in furtherance of its purpose. An 1842 amendment prevented the payment of damages to the landowner from whom land was taken "until the land . . . shall have been entered upon, and possession taken for the purpose of constructing said highway or alteration." St. 1842, c. 86, § 1. A similar amendment in 1892 required applications for the revision of the judgment in the assessment of damages be brought within "one year, to be reckoned, in the case of the taking of land, from the day when the highway is entered upon and possession taken for the purpose of constructing the same, in the case of specific repairs, from the day when the work is actually commenced." St. 1892, c. 415, § 1. Takings procedures such as these have since been consolidated in G. L. c. 79. See G. L. c. 82, § 7. See also St. 1918, c. 257, §§ 187, 208; *Walker* v. *Medford,* 272 Mass. 161, 163-164 (1930).

governing counties and the county commissioners, for example, sets forth various qualifications, duties, and powers of the commissioners. Section 25 of that chapter, inserted by St. 1967, c. 698, empowers the commissioners to acquire real property by eminent domain for "open spaces." It provides:

> "The commissioners may . . . acquire by eminent domain . . . the fee or other lesser interest in such real property within their respective counties as may be necessary to maintain, improve, protect, limit the future use of or otherwise conserve and properly utilize open spaces, and may control and manage the same."

G. L. c. 34, § 25. Securing access to an open public space like a beach[7] would enable the commissioners to ensure, under the statute, that the beach be "properly utilize[d]," and allow them to "control and manage the same." We presume that if, as the commissioners claim, G. L. c. 82 conveys the authority to take lands to secure access to open spaces, the Legislature would have been aware of it when it enacted G. L. c. 34, § 25. See *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 582-583 (1994), and cases cited. Granting that authority in G. L. c. 34, § 25, would in such an instance have been unnecessary.[8]

If G. L. c. 34, § 25, offers a more plausible basis for the takings, why did the commissioners choose to proceed under G. L.

---

[7]Although "open spaces" is not expressly defined in G. L. c. 34, § 25, it would include space on a public beach. General Laws c. 12, § 11D, for example, includes "open spaces" in a noninclusive list of land that may be subject to "damage to the environment": "seashores, dunes, marine resources, underwater archaeological resources, wetlands, open spaces, natural areas, parks or historic districts or sites." See *Boston Ass'n of Sch. Adm'rs & Supervisors* v. *Boston Retirement Bd.*, 383 Mass. 336, 341 (1981) (generic phrase takes its color of meaning from more specific words in a list). Cf. *Arnold* v. *Commissioner of Corps. & Taxation*, 327 Mass. 694, 700 (1951) (term appearing in different portions of statute to be given one consistent meaning).

[8]General Laws c. 40, § 14, offers another plausible basis for the commissioners to act. The selectmen of a town (who in Nantucket are also the county commissioners, G. L. c. 34, § 4) may "take by eminent domain under chapter seventy-nine, any land, easement or right therein within the city or town not already appropriated to public use, for any municipal purpose for which the purchase or taking of land, easement or right therein is not otherwise authorized or directed by statute [provided that] the taking or purchase . . . has previously been authorized . . . by vote of the town." G. L. c. 40, § 14. See, e.g., *Walker* v. *Medford*, 272 Mass. 161, 163 (1930) (taking for street is

c. 82? The answer may be that G. L. c. 34, § 25, is significantly more restrictive of the commissioners' authority than G. L. c. 82. Acquisitions under G. L. c. 34, § 25, must be "approved by the department of environmental management and the conservation committee of the city or town within which such land lies, or if such city or town has no conservation committee by a two thirds vote of the city council in the case of a city and by a two thirds vote of the board of selectmen in the case of a town." Although the county commissioners are themselves the town of Nantucket's board of selectmen, G. L. c. 34, § 4, so that the selectmen's approval would have been nary an obstacle, obtaining approval from the Department of Environmental Management may have been more onerous. Among the objections to the takings voiced at the public hearings were environmental concerns, including the trampling of vegetation, the destruction of bluffs and dunes, beach erosion, litter, and traffic and parking issues.

Having determined the permissible range of bases for action under G. L. c. 82, we last consider whether the commissioners' actions were authorized by the statute. The commissioners rely in their brief primarily on the fact that the ways "consist either of connections to existing public ways or are newly established public ways preserving historic rights of way connecting one portion of the island to another." The commissioners have specifically disavowed any intent to build roadways on the land taken. Indeed, the very layout of the takings — including twelve purported "highways" into the surf, laid out at 200-foot intervals on one-half mile of beach sand — belies any suggestion that the land might have been intended for that purpose. In the absence of such an intent, the stated goals of preserving "historic rights of way" and connecting on paper "existing public ways" do not bring the takings within the scope of G. L.

for municipal purpose).

General Laws c. 40, § 8C, also provides that a city or town, after establishing a "conservation commission," may, "upon the written request of the commission, take by eminent domain under chapter seventy-nine, the fee or any lesser interest in any land or waters located in such city or town," as is "necessary to acquire, maintain, improve, protect, limit the future use of or otherwise conserve and properly utilize open spaces in land and water areas within [the commission's] city or town." The record does not reflect whether there exists a conservation commission in Nantucket.

c. 82. Claims concerning access to homes or parking control are similarly outside the scope of the authority granted where no highways are intended to be constructed. The commissioners evidently intended to lay out only "paper" roads by these takings, in effect creating and securing access to a public beach. Without more, these lines on paper fail to establish that the takings were for highway purposes under G. L. c. 82. Cf. *Perry* v. *Planning Bd. of Nantucket*, 15 Mass. App. Ct. 144, 159 n.13 (1983) (noting that G. L. c. 82 could be used "perversely to impede otherwise lawful land development through the taking of easements for highways which are never constructed or abandoned").

The judgment is reversed, and the takings orders enacted under the authority of G. L. c. 82, § 7, are hereby vacated.

*So ordered.*