Billings, A.J.
The plaintiffs were all convicted of crimes for which they were required, under G.L.c. 6, §178E, to register with the Sex Offender Registry Board (the “Board”). Subsequently, the Board has finally classified each of them as a “Level 3" sex offender, meaning that the Board has determined, pursuant to proceedings held under c. 6, §178K, that the offender’s risk of reoffense and dangerousness to the public are high.[3]
This action was prompted by the Governor’s announcement on April 2, 2003 that the Board, beginning May 15, 2003, would post the names, home and work addresses, descriptions, and criminal record information concerning Level 3 offenders on its website for access by the public. The day they filed their complaint the plaintiffs sought, and I allowed, a temporary restraining order, barring the Board from “going live” with this aspect of its website until further hearing and order. On May 21, having received the Board’s papers in opposition, I heard arguments on whether the TRO should ripen into a preliminary injunction.
I have now carefully considered the written submissions and the arguments of both sides. The plaintiffs’ motion for preliminary injunction is ALLOWED.
I. BACKGROUND
A. The Act and Prior Court Challenges
In 1996, Massachusetts became the last American jurisdiction to enact aversion of the so-called “Megan’s Law.”[4] The Massachusetts statute, G.L.c. 6, §§178C-1780 (herein, the “Act”), has seen numerous court challenges and a substantial revision in 1999, discussed below.
Generally speaking, the Act may be described as having three components: registration, classification, and notification.
Persons convicted of specified sex offenses are required to register with the Board, to advise the Board of changes in work or home address, and in some cases to appear annually at his local police department for updating of photo and fingerprints. See §§178E-178H.
The Board classifies registered offenders into three groups according to its determination of the likelihood of reoffense and degree of dangerousness to the public, Level 1 posing the least and Level 3 the greatest risk. See §178K.
Finally, there are provisions for notification of law enforcement and members of the public of certain information concerning Level 2 and Level 3 sex offenders. These provisions (§§1781 — 178K) are described in greater detail below.
Since even before its passage, the Act has been the subject of numerous decisions by the Supreme Judicial Court, approving, disapproving, and modifying on constitutional grounds certain of its provisions. See, in chronological order:
Opinion of the Justices, 423 Mass. 1201 (1996), in which the SJC advised on various aspects of Senate Bill No. 2276 — which the Legislature passed later that year, but with substantial changes — and held that the bill did not on its face violate the ex post facto clauses of the state and federal constitutions; that the bill’s scheme for classifying offenders according to risk of reoffense satisfied the state and federal due process and equal protection clauses; and that the community notification provisions did not transgress any constitutional right of privacy or the prohibitions against cruel and unusual punishment and double jeopardy;
Doe v. Attorney General (No. 1), 425 Mass. 210 (1997) (“Doe [No. 1]’), holding that the law as en *303 acted overrode G.L.c. 119, §60A, regarding the confidentiality of juvenile records;
Doe v. Attorney General (No. 2), 425 Mass. 217 (1997) (“Doe [No. 2D, upholding a preliminary injunction and approving motion judge’s determination that G.L.c. 6, §1781, because it did not require the requestor to certify that the information was needed for his/her own protection or that of a child or other person in his/her care[5] lacked “any apparent remedial purpose,” and therefore likely violated the double jeopardy and ex post facto clauses as applied to persons convicted of pre-enactment sex offenses;
Doe v. Attorney General, 426 Mass. 136 (1997) (“Doe [No. 3]'), holding in the case of a person convicted of indecent assault and battery that the lack of any provision in the statute for an individualized hearing concerning a registrant’s likelihood of reoffense, before a determination as to whether he was required to register and whether information about him would be disclose publicly, violated the due process protections of Article 12 of the of the state constitution’s Declaration of Rights;
Doe v. Sex Offender Registry Board, 428 Mass. 90 (1998) (“Doe [No. 4D, holding that the hearing required by Doe [No. 3] was to be held before the Board; that proof was to be by a preponderance of the evidence; and that review in the Superior Court would be pursuant to G.L.c. 30A;
Doe v. Attorney General, 430 Mass. 155 (1999) (“Doe [No. 5D, holding that a juvenile adjudged a delinquent for rape of a child was entitled to an individualized hearing concerning whether he should be required to register, at least absent “carefully tailored regulations” which might “treat certain offenders ... as automatically presenting a threat to vulnerable populations,” and thus as subject to an automatic registration requirement; and
Roe v. Attorney General, 434 Mass. 418 (2001) (“Roe”), considering a revision of the Act enacted in 1999 (“apparently in an effort to comply with [the SJC’s] past requirements,” 434 Mass. at 423), and holding that the requirement that a person convicted of a sex offense inform the Board of his name, home address, and work address, and permitting the Board to transmit this information to law enforcement authorities, all before the individual had received a hearing on present dangerousness, did not offend due process.
B. The Act’s Provisions for Dissemination of Offender Information
As just noted, in 1999 the Legislature substantially overhauled the Act in an effort to bring it into compliance with the SJC’s various Doe holdings. To the same end, the Board has enacted detailed regulations. 803 C.M.R. §§1.01-1.41. The regulations focus in large part on registration and classification — particularly, on the administrative procedures attending the hearings required by Doe [Nos. 3, 4 and 5], and on the substance of the Board’s determinations of risk of reoffense and dangerousness — but also treat to a limited extent (at §§ 1.27-1.34) procedures for the dissemination of offender information to law enforcement and to communities.
Neither the statute nor the Board’s regulations expressly address the posting of sex offender information on the Internet, a fact whose significance is discussed below. Rather, the current statutory and regulatory scheme provide for the following forms of dissemination of such information. (The referenced statutory sections are reprinted in full in the Appendix to this decision.)
1. Dissemination by the Board to Law Enforcement
Under G.L.c. 6, §178K(2)(b) and (c), the Board is required to transmit Level 2 and Level 3 offender information “to the police departments in the municipalities where the sex offender lives and works or, if in custody, intends to live and work upon release and where the offense was committed and to the Federal Bureau of Investigation.” Police departments of neighboring municipalities are to directed share information concerning Level 3 offenders.[6]
2. Response to Public Inquiries (“Passive” Dissemination)
Section §178K(2)(b) and (c) also provide that the public shall have access to the information regarding a Level 2 or Level 3 offender in accordance with sections 1781 and 178J. Under the terms of those sections, the Board’s regulations, and present practice, a member of the public may receive information about certain offenders in one of two ways: from the Board under section 1781, or from a local police department under section 178J.
a. Inquiry to the Board (§1781)
If a member of the public has sufficient identifying information for a particular individual, s/he may make a written request to the Board for registry information about that individual, provided the requestor is over 18 and certifies that s/he is requesting the information for his/her own protection or that of a child or other person in his/her care. The Board may only release information as to a Level 2 or Level 3 offender, and must accompany it with a warning concerning the penalties for illegal use. G.L.c. 6, § 1781. The Board’s regulations indicate that it will respond to such a request with a report indicating whether the individual has been finally classified as a Level 2 or Level 3 offender, and if so, the offense(s) and date(s) of the offender’s conviction(s). 803 C.M.R. §1.32(1).
b. Inquiry to Police (§178J)
(i) Specified Individuals. Requests by the public for information concerning specific, identified individuals may also be made of a police department. If a search *304 of the registiy determines that the individual has finally been classified as a Level 2 or a Level 3 offender, the police are to inform the requestor of the offender’s name, home and/or work address if located in the same city, town or street as the requestor, offenses and dates of conviction, age, sex, race, height, weight, eye and hair color, and a photo if available. The requestor must be at least 18; supply proper identification; require the information for his/her own protection or that of a child or other person in his/her care, and so state; complete and sign a record of inquiry (including the requestor’s name and address, the subject, the purpose of the inquiry, and a certification that the information is required for the requestor’s own protection or that of a child or other person in his/her care); and receive a warning concerning the penalties for illegal use. G.L.c. 6, §178J.
(ii)Individuals in Specified Municipality, Street, or Address. Additionally, a requestor may inquire of a police department whether any Level 2 or Level 3 sex offenders live or work in the same city or town, at a specific address, or on a specific street within the city or town. The same requirements (requestor’s age, identification, purpose, completion of record of inquiry, and receipt of legal warning) apply as in a request to a police department for information concerning an identified individual. If there are any Level 2 or Level 3 offenders meeting the terms of the inquiry, the requestor is given names and the same additional information (home and/or work address, offenses and dates of conviction, age, sex, race, height, weight, eye and hair color, and a photo if available) as is provided in response to an inquiry about a specified individual. Id.
3. “Active” Community Notification by Police and Board
Sections 1781 and 178J, just summarized, provide for what is sometimes referred to as “passive notification,” because offender information is disseminated only in response to a specific inquiry from a member of the public. Section 178K(2)(c), by contrast, provides for “active” notification with regard to Level 3 offenders only (those determined to be at high risk of re-offense). In that section, active notification is prescribed as follows:
A level 3 community notification plan shall require the police department to notify organizations in the community which are likely to encounter such sex offender and individual members of the public who are likely to encounter such sex offender.
Neighboring police districts shall share sex offender registration information of level 3 offenders and may inform the residents of their municipality of a sex offender they are likely to encounter who resides in an adjacent city or town.
The police or the board shall actively disseminate in such time and manner as such police department or board deems reasonably necessary the following information:
(i) the name of the sex offender;
(ii) the offender’s home address;
(iii) the offender’s work address;
(iv) the offense for which the offender was convicted or adjudicated and the date of the conviction or adjudication;
(v) the sex offender’s age, sex, race, height, weight, eye and hair color; and
(vi) a photograph of the sex offender, if available; provided, however, that the police or the board shall not release information identifying the victim by name, address or relation to the sex offender.
The same section continues:
All notices to the community shall include a warning regarding the criminal penalties for use of sex offender registry information to commit a crime or to engage in illegal discrimination or harassment of an offender and the punishment for threatening to commit a crime under section 4 of chapter 275. The public shall have access to the information regarding a level 3 offender in accordance with sections 1781 and 178J.[7]
C. The Proposed Website
The Board has provided the Court with mock-ups (using fictional offender names and information) of the format it intends for the various screens in the offender information portion of its website. Appropriately — and in the grand tradition of website design — the procedures and disclosures employed on the Board’s website are substantially analogous to those required and currently employed for responding to public requests for offender information, whether mailed to the Board or made in person at local police stations.
A hyperlink on the Board’s “Welcome” screen takes the user to a screen titled, “Information about Sex Offenders in your Community.” This provides intro-ductoiy information and offers the choice, through hyperlinks, of “level 2 and 3 offender count totals by city or town,” or “view detailed information on classified level 3 offenders.”
Selecting the latter link takes the viewer to a page called “User Acknowledgment and Acceptance.” This page contains the following:
Pursuant to M.G.L.c. 6, §§178C-178P, the individuals who appear on the following notifications have been designated Level 3 Sex Offenders by the Sex Offender Registry Board. The Board has determined that these individuals have a high risk to reoffend and that the degree of dangerousness posed to the public is such that a substantial public safety interest is served by active community notification. Individuals are not wanted by police.
*305 This page also informs the user of the criminal penalties for using registry information to commit a crime, threaten to commit a crime, or engage in illegal discrimination or harassment, and requires the user to agree that s/he is 18 or older, has read and understood the statements on the page, and is “requesting this information for [his/her] own protection or for the protection of a child or another person for whom [s/he has] responsibility, care or custody, and that [s/he] believe[s s/he is] likely to encounter an offender who may be posted on this website.” The text of the penalties notice and the user agreement is taken from the statutory requirements for an inquiry of the Board (under section 1781) or a police department (under section 178J).
Users are not required to open a user account, use a password, or provide any identifying information about themselves to obtain sex offender information, but are required to select an “I Agree” link to proceed further. If s/he clicks on “I Agree,” s/he is directed to a “Search Form” screen. This has blank fields for Last Name, City Name, County, and Postal Code, with which the user is invited — by filling in one or more of the blank fields — to obtain information either about individuals with a known last name[8] or individuals living or working in a given city or town, county, or zip code.
Submitting a request brings the user to a “Search Results” screen, with a line for each offender retrieved by the search, showing: first name, last name, the city or town in which the registrant lives or works (specifying which), county, postal code, and a hyperlink for “Detail.” The warning concerning penalties for misuse is repeated at the top of the screen.
Selecting the “Detail” link for an individual brings the user to a screen entitled, “Level 3 Sex Offender— Detail Flyer,” and devoted to information about a single offender. This screen begins with a repetition of the notice, quoted above from the “User Acknowledgment and Acceptance” screen, concerning the individual’s classification as a Level 3 offender. There is a photograph of the offender, together with: name, age, race, sex, height, weight, hair color, eye color, home or work address (specifying which), and the offense title and date of each conviction.
Each of the screens, beginning with the “User Acknowledgment and Acceptance,” also contains a notice at the bottom inviting the user, “if further information is needed,” to contact the Board, and gives a telephone number and office hours. Links with offender information additionally have a “print this document” option.
The Board’s counsel has represented by letter, in response to an inquiry of mine at the preliminary injunction hearing, that information about individual offenders will not reside on the pages of the website, but rather in a separate table or directory which is queried by the website. This information therefore cannot be accessed by internet search engines (Google, Yahoo, etc.); they are accessible only through the “User Acknowledgment and Acceptance” screen.[9] I cannot and do not resolve at this stage of the proceedings whether this structure provides a foolproof guarantee that all viewers of offender information will have made the requisite acknowledgments and received the requisite legal notices, but neither does the statutory construction issue which I regard as determinative of the case depend on the answer to this factual question.
II. DISCUSSION
Standard for Preliminary Injunction
The nature of the proceedings on a motion for preliminary injunction, and the standard for its issuance, are familiar:
By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law. On the basis of this record, the moving party must show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits. Should the injunction issue, however, the enjoined party may suffer precisely the same type of irreparable harm. Since the judge’s assessment of the parties’ lawful rights at the preliminary stage of the proceedings may not correspond to the final judgment, the judge should seek to minimize the “harm that final relief cannot redress,” by creating or preserving, in so far as possible, a state of affairs such that after the full trial, a meaningful decision may be rendered for either party.
Therefore, when asked to grant a preliminary injunction, the judge initially evaluates in combination the moving party’s claim of injury and chance of success on the merits. If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.
Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
B. Likelihood of Success on the Merits
Neither the statute nor the Board’s regulations explicitly address the posting of offender information on the Internet. The Opinion of the Justices, Doe [Nos. 2-5], and Roe decisions discussed above addressed primarily the Board’s procedures for registration and *306 classification, and consider only secondarily the manner of disseminating offender information once the offender has registered and received a classification. The permissibility internet posting, therefore, is an issue of first impression in Massachusetts.[10]
The plaintiffs’ argument on the merits is twofold: (a) that the proposed internet posting of their registry information would violate the liberty and property interests protected by Article 12 of the Declaration of Rights in the Massachusetts Constitution[11] and (b) that even if constitutional, internet posting exceeds what the Legislature has authorized in the Act.
Before reaching the issue of constitutionality, it is appropriate to consider that of statutory construction. “Issues of statutory interpretation should be resolved prior to reaching any constitutional issue.” 1010 Memorial Drive Tenants Corp. v. Fire Chief of Cambridge, 424 Mass. 661, 663 (1997). Of course, it is the Court’s “duty to construe statutes so as to avoid such constitutional difficulties, if reasonable principles of interpretation permit it.” Blixt v. Blixt, 437 Mass. 649, 674 (2002), quoting School Comm. of Greenfield v. Greenfield Educ. Ass’n, 385 Mass. 70, 79 (1982). The first question in every case, though, has to be: what did the Legislature mean by the language it employed in the statute?
We interpret a statute “according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language ... to the end that the purpose of its framers may be effectuated.”
Chandler v. County Comm’rs of Nantucket County, 437 Mass. 430, 435 (2002), quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934). Only if it appeared that the Legislature intended to permit Internet posting — or at least to give the Board sufficiently broad regulatory authority to encompass this means of disseminating offender information to the public — would it be necessary to consider whether such dissemination violates the offenders’ rights under Article 12.
That said, it is both apparent and significant that the Legislature was guided by constitutional considerations when, in 1999, it substantially overhauled the Act to bring it into line with SJC precedents. It cannot have escaped the attention of the Great and General Court that the Supreme Judicial Court had considered the Act’s constitutionality no fewer than four times (Doe [Nos. 2-5]) in the three years following its enactment, in addition to the advisory opinion that had immediately preceded it.
In every case, it is “presumed that the Legislature knew preexisting law and the decisions of [the Supreme Judicial] court.” Condon v. Haitsma, 325 Mass. 371, 373 (1950). The presumption is especially apt in this case, where the 1999 revision of the Act evidences scrupulous attention to the constitutional requirements imposed in the Doe cases. For example:
The omission, in old section 1781, of any requirement that a requestor certify that s/he seeks registry information “for his own protection or for the protection of a child under the age of eighteen or another person for whom said inquirer has responsibility, care or custody,” which the court criticized in Doe [No. 2], 425 Mass. at 220, is remedied in the 1999 revision.
The requirement of an individualized hearing concerning a registrant’s likelihood of re-offense (Doe [No. 3}), and the suggestions that the hearing be before the Board, that the preponderance standard apply, and that review be in the Superior Court under Chapter 30A (Doe [No. 4]) are all carried out in revised sections 178K(3), 178L, and 178M.
It bears noting, then, that the SJC has stated repeatedly that the notification provisions — which are, after all, the raison d’etre of the Act — substantially impact the liberty and privacy interests of offenders[12] (otherwise, the due process requirements of Article 12 would not come into play at all), and that the balance between these interests, versus the public safety interest in disseminating offender information to those who may need it, must be struck precisely and with care.
[W]hile respecting the needs of practical regulation and the concerns expressed by the Legislature, the Justices judge this bill insofar as the questions require us to do so, by looking not just to its stated regulatory purpose, but also its effect on those to whom it is to be applied and on others, and its resemblance to other measures that have firmly been established to count as either regulatory or criminal. The more harshly the measures bear on the individual and the more closely they resemble traditional criminal sanctions, the more urgent must be the regulatory concern, the more soundly rooted in fact rather than prejudice and conjecture must be the basis for that concern, and the more closely we must insist that the proffered regulation must hew to the well-grounded regulatory aim.
[T]he very detailed instructions to the board [in the Senate bill under consideration], which is to frame the implementing guidelines, make evident a purpose to provide community notification only where notification will allow particular members of the public who are in an especially vulnerable situation (or are responsible for the care of persons, like children, who are in an especially vulnerable situation) to take measures lawfully available to them to protect themselves against danger. Such a purpose is plainly regulatory in that it seeks to prevent harm.
Opinion of the Justices, 423 Mass. at 1223-24, 1226-27 (emphasis supplied).
*307 We have recognized . . . that regulation may be imposed after a careful weighing of three factors: the kind and severity of the regulatory imposition, the kind and severity of the danger sought to be averted, and the aptness of the fit between the remedial measure and the danger to be averted.
Registration and notification may be useful, and in any event are constitutionally permissible means for protecting the public, but only if they are narrowly tailored to a grave danger.
Doe [No. 3], 426 Mass. at 149, 151 (Fried, J., concurring; emphasis supplied)); see also Doe [No. 2], 425 Mass. at 221-22 (permitting access to offender information by “(a]ny adult,... for any reason or no reason at all” served no remedial purpose); Doe [No. 4], 428 Mass. at 107 (Marshall, J., concurring in part and dissenting in part) (“The State has no interest in . . . implementing overbroad . . . notifications”).
As it did with the procedural due process requirements that the SJC imposed with respect to registration and classification, the Legislature appears to have taken these cautions to heart when it prescribed the methods of notification under the Act. The precisely drafted provisions of sections 1787, 178J, and 178K(2) evidence close attention to the liberty and privacy interests of offenders, the safety interests of the public, the balance between these two competing sets of interests, and — especially—the “aptness of the fit between the remedial measure and the danger to be averted.” 426 Mass. at 149. Thus, a member of the public may request offender information in three, and only three, ways: s/he may seek information about identified offenders by written request to the Board; s/he may make the same request in person at a local police station; or s/he may obtain information about unidentified offenders living in a municipality by in-person request at that municipality’s police department. In each case, the requestor must be at least eighteen; provide proper identification; certify a proper purpose; and receive a warning concerning the criminal penalties for illegal use. This is the full extent of “passive” notification permitted by the Act.
Undeniably, where “active” notification is concerned, the Board and the police are, in section 178K(2)(c), given discretion concerning methods and means. In particular, the Board points to that section’s direction that “(t]he police or the board shall actively disseminate in such time and manner as such police department or board deems reasonably necessary the following information . . .,”[13] and argues that this language is sufficiently broad to encompass the proposed website.
The difficulty with this argument is that the just-quoted sentence appears in a context, which is a section entirely devoted to community notification. The section stresses, in virtually every sentence, the local nature of the enterprise:
. . . the board shall transmit the registration data and designation to the police departments in the municipalities where the sex offender lives and works or, if in custody, intends to live and work upon release and where the offense was committed
... A level 3 community notification plan shall require the police department to notify organizations in the community which are likely to encounter such sex offender and individual members of the public who are likely to encounter such sex offender.
. . . Neighboring police districts shall share sex offender registration information of level 3 offenders and may inform the residents of their municipality of a sex offender they are likely to encounter who resides in an adjacent city or town. . .
The police or the board shall actively disseminate in such time and manner as such police department or board deems reasonably necessary the following information . . .
... All notices to the community shall include a warning regarding the criminal penalties . . .
The public shall have access to the information regarding a level 3 offender in accordance with sections 1787 and 178 J. . .
(Emphasis supplied.)
In context, it is clear that the bolded sentence refers, like the rest of the section, to methods of “community notification” targeted to reach individuals who are at least reasonably “likely to encounter” the sex offender(s) who are the subject of the notification. The sentence — and even the seemingly broad reference to “such time and manner as . . . [the] board deems reasonably necessary” — cannot, in other words, be plucked from its context as part of a section concerning community notification, and read as permitting worldwide notification. See, e.g., Turner v. Lewis, 434 Mass. 331, 334 (2001) (“A general term in a statute . . . takes meaning from the setting in which it is employed”); Commonwealth v. Brooks, 366 Mass. 423, 429 (1974) (“words in a statute must be considered in light of the other words surrounding them”); Attorney Gen. v. School Comm. of Essex, 387 Mass. 326, 337 (1982) (“In construing a statute, words or phrases used in one part of a statute should be related and considered in light of their context”).
As it happens, the “time and manner” provision of section 178K(2)(c) has fostered a lively and diverse array of community notification programs across the Commonwealth. One hears of police-sponsored community meetings; of flyers posted by the police in public locations in the community; of police notices in local papers and spots on local access television programs; and even of websites sponsored by local police departments containing identities, descriptions, pho *308 tos, and offense information of level 3 offenders who reside or work in the community (much the same information, in other words, as the Board proposes for its website, but limited to offenders living or working within the Department’s jurisdiction).[14]
All of the just-mentioned “active” notification methods have in common the fact that they are targeted to members of a particular community who, by reason of geographic proximity, are reasonably likely to encounter a particular offender. Even a police department’s website, while accessible by anyone in the world with an internet connection and the desire to find it, is unlikely to attract much interest or attention outside the community of persons who live, work, or intend to visit in that department’s jurisdiction.
The Board’s proposed website would accomplish much broader public access to registry information, at a single sitting, than is now possible. To illustrate: there are 355 cities and towns, within fourteen counties, in Massachusetts. Presently, to obtain identities and other information on all 406 individuals currently classified as Level 3 offenders, one would have to visit all or most of the state’s 355 police departments.
By contrast, in the format currently proposed for the website, fourteen searches — one search for offenders in each of the state’s fourteen counties — would yield every Level 3 offender’s first name, last name, and municipalityjies) where the offender lives and works. From these search results, full identifying information, offense information, and a photo of each offender is but a mouse click away. In an hour or two, with a reasonably fast connection and printer, a user anywhere in the world could compile the “book” on all Level 3 offenders in the state.
The Board’s proposed website would, appropriately,' advise its users of the criminal penalties for misuse, and would require them to agree that they meet the statutoiy criteria for “passive” dissemination — a person 18 or older, who has read and understands the warnings, who intends to use the information for protection of self or of a child under the age of eighteen or another person for whom the user has responsibility, care or custody. One nevertheless wonders whether an individual or group interested in harassment or even vigilante action, toward this least popular segment of the population, will be greatly deterred by the need to click an “I Agree” button, particularly since the user is not required to establish a user account, or to provide any sort of identifying information such as name, address, or driver’s license or credit card number (any of which might at least inhibit, and enable the Board to investigate, illegal use of registry information). The website is, in any event, a substantial departure from the present, statutorily authorized system, in which a statewide search is possible only at the price of significant effort and a re-traceable trail.
Here is not the place to debate the merits and demerits, from the standpoint of penology, social policy, or public safety, of maximum, worldwide publicity of the identities of individuals who have committed serious sex crimes and pose a high risk of reoffense. That debate is for the Legislature, within the constitutional constraints set forth in the SJC cases discussed earlier in this opinion. For now, the Court’s task is to ascertain whether the Legislature intended by the Act to authorize this form of notification if the Board “deems [it] reasonably necessary.”
Applying the traditional rules of statutory construction summarized above, I conclude that it did not. The methods of dissemination which the Legislature did authorize appear to have been carefully selected, (a) to accommodate persons who wish to determine, for reasons of personal or family safety, whether an employee, job applicant, co-worker, babysitter, relative or in-law, acquaintance, romantic partner, or other person with whom s/he or a family member has or might have contact is a Level 3 sex offender (§1781); (b) to accommodate as well persons who wish to determine — again, for reasons of safety — whether any such offenders inhabit or work in a particular neighborhood or municipality (§178J); (c) to authorize targeted community alerts concerning the presence of such offenders, and to permit flexibility of method in such alerts (§178K(2)(c)); (d) to minimize the likelihood of harassment and vigilanteism by persons not otherwise likely to come into contact with offenders; and (e) in these ways to accommodate the constitutional requirement of “aptness of the fit between the remedial measure and the danger to be averted.” 446 Mass. at 151.
I note as well that the Internet was firmly embedded in American and world culture at the time of the September 1999 revision of the Act. At that time, fifteen states had enacted registration and notification laws which authorized Internet posting of sex offender registration information.[15] The Act’s omission of any mention of Internet dissemination, and its careful delineations of the permitted methods of public inquiry, bespeak a Legislative intention to stop short of full disclosure to anyone in the world with an Internet connection.
“[A]n administrative board or officer has no authority to promulgate rules and regulations which are in conflict with the statutes or exceed the authority conferred by the statutes by which such board or office was created.” Bureau of Old Age Assistance v. Comm’r of Public Welfare, 326 Mass. 121, 124 (1950). The proposed website would go beyond what the Legislature has authorized. I therefore conclude that the plaintiffs have made a substantial showing of likelihood of success on the merits.
C. Balance of Harms
The balance of harms represents a closer question. Undeniably, the Board’s proposed website would foster greater awareness of the identities and whereabouts of Level 3 offenders throughout the state, with (many would argue) a correspondingly positive effect *309 on public safely. These are, after all, individuals who have been convicted of serious crimes and have been determined, following a hearing, to pose a high risk of recidivism. The Board argues, not without force, that sex offenders who have completed the committed portions of their sentences are just as mobile as anyone else, and are unlikely to stay in the municipalities where they live or work; that members of the public may have legitimate reasons for wishing to know the identities of offenders who do not live or work in the same town as they; that visits to police stations are inconvenient; and that the Internet provides the most efficient way of getting truthful information out to the public.
On the other hand, allowing the website to “go live” during the pendency of these proceedings will have consequences that cannot be undone. The sex offender websites of other states have had millions of “hits.” Beyond this, “[digital information has a veritably infinite lifespan. As a result, it can resurface at any time . . . Even the Internet is being archived.” E. Lin, Prioritizing Privacy: A Constitutional Response to the Internet, 17 Berkeley Tech. L.J. 1085, 1102 & n. 85 (2002). Information once disseminated on the World Wide Web would be impossible to pull back in the event of a final disposition in the plaintiffs’ favor in this case.
Convicted sex offenders make easy and popular targets of public wrath. There reportedly have been
numerous instances in which sex offenders have suffered harm in the aftermath of notification— ranging from public shunning, picketing, press vigils, ostracism, loss of employment, and eviction, to threats of violence, physical attacks, and arson . .. Retribution has been visited by private, unlawful violence and threats and, while such incidents of “vigilante justice” are not common, they happen with sufficient frequency and publicity that registrants justifiably live in fear of them.
Smith v. Doe, 123 S.Ct. at 1156 (Souter, J., concurring and quoting from Doe v. Patacki, 120 F.3d 1263, 1279 (2d Cir. 1997), and E.B. v. Verniero, 119 F.3d 1077, 1102 (3d Cir. 1997)). The plaintiffs in the present case report that following registration, they have been subjected to obscene taunts toward themselves and their families, threats of bodily harm, and a vandalized automobile, among other consequences of the Act’s currently authorized means of notification.
As noted above, this proceeding is not the forum to debate the pros and cons of notification, or the social acceptability of the stigma that it places on offenders who have, in many cases, inflicted a lifetime of emotional and/or physical harm upon their victims. Suffice it to say that were the plaintiffs to prevail on the merits after having been denied a preliminary injunction, it would be difficult, if not impossible, to un-ring the bell. See Doe [No. 2], 425 Mass. at 222 (improper dissemination of registry information posed “substantial” risk of irreparable harm “from the use of such information for other than personal protection”).
The public, on the other hand, already has substantial access to registry information, on a need-to-know basis, according to a carefully crafted and delimited set of procedures by which notification is targeted at those likely to encounter sex offenders in their communities. Just as not everyone uses the Internet, the present array of non-Internet notification methods may not reach everyone, either. They are, however, what the statute authorizes. The proposed website goes beyond that authorization.
Applying the Packaging Industries standard, therefore, I conclude that the plaintiffs’ likelihood of success on the merits, taken in combination with the likely irreparable harm to both parties and the public interest, favors the issuance of the requested injunction.
ORDER FOR RELIEF
For the foregoing reasons, the plaintiffs request for a preliminary injunction is ALLOWED. The defendant is enjoined from posting offender-specific registration information on the Internet, pending further order of this or an appellate court.
APPENDIX
STATUTORY PROVISIONS REGARDING COMMUNITY NOTIFICATION
§1781 Report identifying sex offender; request for information; confidentiality
Any person who is 18 years of age or older and who states that he is requesting sex offender registry information for his own protection or for the protection of a child under the age of 18 or another person for whom the requesting person has responsibility, care or custody shall receive at no cost from the board a report to the extent available pursuant to sections 178C to 178P, inclusive, which indicates whether an individual identified by name, date of birth or sufficient personal identifying characteristics is a sex offender with an obligation to register pursuant to this chapter, the offenses for which he was convicted or adjudicated and the dates of such convictions or adjudications. Any records of inquiry shall be kept confidential, except that the records may be disseminated to assist or defend in a criminal prosecution.
Information about an offender shall be made available pursuant to this section only if the offender is a sex offender who has been finally classified by the board as a level 2 or level 3 sex offender.
All reports to persons making inquiries shall include a warning regarding the criminal penalties for use of sex offender registry information to commit a crime or to engage in illegal discrimination or harassment of an offender and the punishment for threatening to commit a crime under section 4 of chapter 275.
*310 The board shall not release information identifying the victim by name, address or relation to the offender.
§178J. Request for sex offender information; notice of penalty for misuse; data required to receive report
(a) A person who requests sex offender registry information shall:
(1) be 18 years of age or older;
(2) appear in person at a city or town police station and present proper identification;
(3) require sex offender registry information for his own protection or for the protection of a child under the age of 18 or another person for whom such inquirer has responsibility, care or custody, and so state; and
(4) complete and sign a record of inquiry, designed by the board, which shall include the following information: the name and address of the person making the inquiry, the person or geographic area or street which is the subject of the inquiry, the reason for the inquiry and the date and time of the inquiry.
Such records of inquiries shall include a warning regarding the criminal penalties for use of sex offender registry information to commit a crime or to engage in illegal discrimination or harassment of an offender and the punishment for threatening to commit a crime under the provisions of section 4 of chapter 275. Such records of inquiries shall state, before the signature of the inquirer, as follows: “I understand that the sex offender registry information disclosed to me is intended for my own protection or for the protection of a child under the age of 18 or another person for whom I have responsibility, care or custody.” Such records of inquiries shall be kept confidential, except that such records may be disseminated to assist in a criminal prosecution.
(b) The person making the inquiry may either:
(1) identify a specific individual by name or provide personal identifying information sufficient to allow the police to identify the subject of the inquiry; or
(2) inquire whether any sex offenders live or work within the same city or town at a specific address including, but not limited to, a residential address, a business address, school, after-school program, day care center, playground, recreational area or other identified address and inquire in another city or town whether any sex offenders live or work within that city or town, upon a reasonable showing that the sex offender registry information is requested for his own protection or for the protection of a child under the age of 18 or another person for whom the inquirer has responsibility, care or custody; or
(3)inquire whether any sex offenders live or work on a specific street within the city or town in which such inquiiy is made.
(c)If the search of the sex offender registry results in the identification of a sex offender required to register pursuant to this chapter who has been finally classified by the board as a level 2 or level 3 offender under section 178K, the police shall disseminate to the person making the inquiry:
(1) the name of the sex offender;
(2) the home address if located in the areas described in clause (2) or (3) of subsection (b);
(3) the work address if located in the areas described in said clause (2) or (3) of said subsection (b);
(4) the offense for which he was convicted or adjudicated and the dates of such conviction or adjudication;
(5) the sex offender’s age, sex, race, height, weight, eye and hair color; and
(6) a photograph of the sex offender, if available.
The police shall not release information identifying the victim by name, address or the victim’s relation to the offender.
C. 6, §178K(2)(c) (excerpted)
(c) Where the board determines that the risk of reoffense is high and the degree of dangerousness posed to the public is such that a substantial public safety interest is served by active dissemination, it shall give a level 3 designation to the sex offender. In such case, the board shall transmit the registration data and designation to the police departments in the municipalities where the sex offender lives and works or, if in custody, intends to live and work upon release and where the offense was committed and to the Federal Bureau of Investigation. A level 3 community-notification plan shall require the police department to notify organizations in the community which are likely to encounter such sex offender and individual members of the public who are likely to encounter such sex offender. The sex offender shall be required to register and to verify registration information pursuant to sections 178FV2. Neighboring police districts shall share sex offender registration information of level 3 offenders and may inform the residents of their municipality of a sex offender they are likely to encounter who resides in an adjacent city or town. The police or the board shall actively disseminate in such time and manner as such police department or board deems reasonably necessary the following information:
(i) the name of the sex offender;
(ii) the offender’s home address;
(iii) the offender’s work address;
*311 (iv) the offense for which the offender was convicted or adjudicated and the date of the conviction or adjudication;
(v) the sex offender’s age, sex, race, height, weight, eye and hair color; and
(vi) a photograph of the sex offender, if available; provided, however, that the police or the board shall not release information identifying the victim by name, address or relation to the sex offender.
All notices to the community shall include a warning regarding the criminal penalties for use of sex offender registry information to commit a crime or to engage in illegal discrimination or harassment of an offender and the punishment for threatening to commit a crime under section 4 of chapter 275.
The public shall have access to the information regarding a level 3 offender in accordance with sections 1781and 178J . . .

Each of the plaintiffs has appealed his classification to the Superior Court pursuant to c. 6, §M and c. 30A. Those cases are in varying stages of completion. For present purposes, I assume that all of the plaintiffs are, and will remain, Level 3 offenders.

“New Jersey enacted registration and notification laws, often referred to as ‘Megan’s Law,’ following the abduction, rape, and murder of a second female child by a formerly convicted sex offender in 1993. See N.J.Stat.Ann. §2C:7-1 to 2C:7-11 (West 1995 & Supp.1996)." Opinion of the Justices, 423 Mass. 1201, 1211 (1996). Encouraged by the federal Jacob Wetterling Act, which conditions certain federal funding on the enactment of community notification laws, all 50 states passed such laws between 1993 and 1996.

“Any adult, merely by presenting identification, may obtain sex offender registry information from the board for any reason or for no reason at all. The board’s disclosures under §1781 are not limited to serving some worthy public purpose . . . The possibility exists . . . that a person with no remedial motive will obtain sex offender registry information and reveal it to the plaintiffs detriment. The potential harm to the plaintiff in his employment or in his community, or both, from the use of such information for other than personal protection is substantial. Once the plaintiff is harmed, at best it will not easily be remediable.” 425 Mass. at 221-22.

Section 178K(2)(c) also requires the Board to transmit information concerning any level 3 offender whom it has determined to be a “sexually violent predator" to the sentencing court, with a recommendation that the offender be so designated. If the court, after an evidentiary hearing, determines that the offender is a sexually violent predator, this information is to be included with the community notifications concerning the offender.

There are additional provisions for persons whom the Board has determined to be “sexually violent predators.”

A partial last name may be used, so that “Smi” would bring up individuals named “Smiley,” “Smith,” Smithson," etc.

Plaintiffs’ counsel have responded by affidavit that using the Google search engine, they were able to obtain registry information directly about randomly selected offenders listed on the Arizona, Colorado, and Florida websites, bypassing any “portal” pages containing legal notices or user agreements. Counsel further represents that it appears that an offender must be listed for a matter of months for his/her data to be accessible in this way. It is not possible to resolve at this stage whether the same might be true of the Board’s proposed website, and if so, the legal ramifications of making offender information accessible to users who have not made the required acknowledgments and received the required legal notices.

Recenffy, the United States Supreme Court has held that the Connecticut and Alaska versions of “Megan’s Law,” both of which provide for internet posting of offender information, comport with the federal constitution. Connecticut Dept. of Public Safety v. Doe, _ U.S. _, 123 S.Ct. 1160 (3/5/03); Smith v. Doe, _ U.S. _ 123 S.Ct. 1140(3/5/03). The plaintiffs in this case do not make a federal constitutional challenge to the Massachusetts statute. The significant differences among the states’ approaches to internet posting, and the sometimes broader sweep of the protections of the Massachusetts constitution (see, e.g., Smith v. Commonwealth, 420 Mass. 291, 295-96 (1995)), mean that the U.S. Supreme Court decisions, while interesting and informative, would not necessarily dispose of the present case even on constitutional grounds. Most importantly, since the present decision is based on the specific provisions of the Massachusetts statute, and not on constitutional grounds, the Connecticut Dept of Public Safety and Smith cases have little to do with the issues presented here.

Article 12 of the Declaration of Rights states: “No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defence by himself, or his counsel, at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land. And the legislature shall not make any law that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury.”

E.g., Roe, 434 Mass. at 423, quoting Doe [No. 5], 430 Mass. at 163.

Emphasis supplied. Similarly broad language appears in the Board’s regulations at 830 C.M.R. §1.32(2).

Another judge of the Superior Court recently denied a Level 3 offender’s motion to preliminarily enjoin the posting of his registry information on the Waltham Police Department website. Soe v. Drew, Middlesex Superior Court Civil Action No. 03-1230, opinion dated 4/5/03 (Brady, J.).

U.S. Department of Justice, “Summary of State Sex Offender Registry Dissemination Procedures” (August 1999), available at http://www.ojp.usdoj.gov/bjs/pub/pdf/sssordp.pdf. The states were: Alabama, Alaska, Connecticut, Delaware, Florida, Georgia, Indiana, Kansas, Michigan, North Carolina, Oregon, South Carolina, Texas, Virginia, and West Virginia.