Ronald P. Passatempo, trustee,[1] & others[2] vs. Frederick V.
McMenimen, Third, & others.[3]

Suffolk. September 8, 2011. - January 12, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, & Lenk, JJ.

*Insurance,* Agent, Life insurance, Fraud and concealment, Misrepresentation.
*Fraud. Consumer Protection Act,* Insurance, Unfair or deceptive act, Dam-
ages, Demand letter. *Limitations, Statute of. Repose, Statute of. Statute,*
Construction. *Damages,* Rescission, Fraud. *Fiduciary. Rules of Civil
Procedure. Practice, Civil,* Service of process, Attorney's fees. *Negligence,*
Economic loss.

This court concluded that G. L. c. 175, § 181, which sets forth a two-year
period in which victims of fraud in the sale of insurance may bring an ac-
tion for rescission against an insurance company, does not create a civil
remedy against insurance agents or employees of insurers [287-288] but
does not immunize such persons from all civil liability [288-289]; further,
neither the text, the purpose, nor the legislative history of the statute sup-
ported a reading that would result in the statute being the sole and exclusive
civil remedy against insurance companies for those who have been induced
to purchase life insurance by fraud [289-291].

In a civil action brought by the plaintiffs, who claimed to have been victims
of fraud in the sale of insurance, asserting common-law claims against the
defendants (the insurance agent, his former employer, and various companies
related to the insurer), the remedy sought by the plaintiffs was distinct
from that provided by G. L. c. 175, § 181, and their common-law claims
of intentional and negligent misrepresentation, having been properly pleaded
in tort, were therefore subject to the limitation period in G. L. c. 260, § 2A
[291-293], which was tolled by the fraudulent concealment of the agent (a
fiduciary of the plaintiffs) as to claims against the agent himself, but not as
to the other defendants [293-297].

This court concluded that G. L. c. 93A, § 9 (1), afforded a private right of ac-
tion to the plaintiffs in a civil action (victims of fraud in the sale of insur-
ance) for unfair trade practices that fell outside the scope of G. L. c. 176D
[297-298]; further, the trial court judge appropriately calculated damages

[1]Of the Samuel Pietropaolo Irrevocable Trust.

[2]Patricia D. Pietropaolo and Samuel Pietropaolo, Jr., executor of the estate
of Samuel Pietropaolo, Sr. (also known as Sabatino Pietropolo).

[3]Barry G. Armstrong; New England Advisory Group, LLC; Nationwide
Life Insurance Company of America; Nationwide Securities, LLC; Nationwide
Financial Services, Inc. Nationwide Securities, LLC, is the successor in inter-
est to 1717 Capital Management Company.

on a benefit of the bargain basis and did not err in awarding treble damages to the plaintiffs [298-299].

In a civil action brought by the plaintiffs, who were victims of fraud in the sale of insurance, the trial judge properly concluded that the plaintiffs' G. L. c. 93A demand letter was legally insufficient as to one defendant. [299-300]

In the circumstances of a civil action brought by the plaintiffs, who were victims of fraud in the sale of insurance, there was no merit to the defendants' contentions that the plaintiffs' claims should have been dismissed for failure to effect timely service [300-301]; that there was insufficient evidence to support a finding of reasonable reliance [301-302]; and that the economic loss doctrine precluded the plaintiffs' negligence claim [302]; further, the judge did not err in denying the plaintiffs' supplemental fee request [303-304].

CIVIL ACTION commenced in the Superior Court Department on July 1, 2004.

A motion for summary judgment was heard by *Ralph D. Gants*, J., and the case was heard by *Margaret R. Hinkle*, J.

*Charles M. Waters* for the plaintiffs.

*Harvey J. Wolkoff* (*Alfred A. Day* with him) for Nationwide Life Insurance Company of America & others.

*Timothy O. Egan* (*John J. O'Connor* with him) for Barry G. Armstrong.

*William P. Corbett, Jr.*, for Frederick V. McMenimen, III.

LENK, J. Samuel Pietropaolo, Sr. (Sam Sr.),[4] directed a substantial portion of his retirement benefits to the upkeep of a life insurance policy that he purchased in 1998 through his nephew, Frederick V. McMenimen, III, an insurance agent. This policy was the sole asset of an irrevocable trust that Sam Sr. established to provide for his wife should he predecease her. McMenimen assured Sam Sr. and the other plaintiffs that the policy provided death benefits of $500,000. In fact, the policy provided only $200,000 in benefits. Although the plaintiffs regularly received accurate policy statements from the insurer that issued the policy, they relied on McMenimen's assurances as to the policy's value for almost six years, only bringing this action in July of 2004. In the parties' third argument before this court,[5] we are asked

---

[4]Because they share a last name, we refer to the members of the Pietropaolo family by their first names, followed, where necessary, by a suffix. References to "the Pietropaolos" include Sam Sr., Sam Jr., and Patricia.

[5]See *McMenimen* v. *Passatempo*, 452 Mass. 178 (2008) (*Passatempo I*),

to decide, among other questions, whether the plaintiffs' common-law and G. L. c. 93A claims against McMenimen, his former employer, and various companies related to the insurer were properly pleaded in tort and under G. L. c. 93A, and whether they are timely under G. L. c. 175, § 181 (§ 181), and G. L. c. 260, §§ 2A, 5A, and 12.

We conclude that the plaintiffs' claims were properly pleaded in tort and under G. L. c. 93A. Their claims are therefore subject to the limitation periods in G. L. c. 260, §§ 2A and 5A, respectively, which are susceptible of tolling. See G. L. c. 260, § 12. We conclude further that McMenimen's fraudulent concealment of these claims tolled the limitation period as to claims against McMenimen himself, but did not toll the limitation period with regard to the remaining defendants. However, because the limitation period for claims brought under G. L. c. 93A is longer than the limitation period for tort claims, the Nationwide defendants have not shown that the plaintiffs' G. L. c. 93A claim against Nationwide is time barred. Finally, we conclude that the trial judge did not err in deciding that the economic loss doctrine did not bar the plaintiffs' common-law claims; determining that it was not unreasonable as a matter of law for the plaintiffs to have relied on McMenimen's misrepresentations; dismissing the plaintiffs' G. L. c. 93A claim against Barry G. Armstrong; determining the amount of the damages on the plaintiffs' G. L. c. 93A claim against McMenimen; or calculating the award of attorney's fees against McMenimen.

1. *Background.* The following are the facts the jury could have found from the evidence at trial.

a. *Parties.* Ronald P. Passatempo, an attorney, is the trustee of the Samuel Pietropaolo Irrevocable Trust (trust). Patricia D. Pietropaolo is the primary beneficiary of the trust. Samuel Pietropaolo, Jr. (Sam Jr.), also an attorney and a former life insurance agent, is the executor of the estate of Sam Sr. Sam Sr. was Patricia's husband, Sam Jr.'s father, and the grantor of the trust.[6]

Frederick V. McMenimen, III, nephew of Patricia and Sam

---

*S.C.*, 458 Mass. 1007, 1010 (2010) (*Passatempo II*) ("the appeal is to be entered directly to this court").

[6]Sam Sr. passed away during the pendency of this litigation.

Sr., was in 1998 an insurance agent employed by New England Advisory Group, LLC (NEAG), a firm owned and managed by Armstrong. NEAG, in turn, was a sales agent of the Provident Mutual Life Insurance Company (Provident Mutual), the firm that issued the insurance policy at the center of this dispute. Provident Mutual was acquired subsequently by what is now Nationwide Life Insurance Company of America, a group of affiliated insurance and investment companies, three of which are defendants in this case.[7]

b. *Facts.* In July, 1997, Sam Sr. had just retired from the Revere school system and was concerned about how best to handle his State retirement benefits. He first consulted Sam Jr., but the two quickly agreed that they should seek advice from McMenimen, Sam Sr.'s nephew. McMenimen had been in the insurance business for almost a decade, and he held himself out to the Pietropaolos as an expert in insuring public sector retirees. McMenimen advised the Pietropaolos that they should choose a retirement plan that would forgo death benefits in favor of higher lifetime distributions, and use the difference to fund a life insurance policy on Sam Sr.'s life that would provide better death benefits than the Commonwealth's plan. This type of plan required a signed waiver of Patricia's statutory survivorship rights, which she agreed to on the understanding that she would receive a $500,000 distribution should Sam Sr. predecease her.

At this time, Sam Sr. already had a $140,000 life insurance policy with John Hancock Mutual Life Insurance Company (John Hancock). McMenimen, who was then an agent for Mutual of New York (MoNY), advised Sam Sr. to supplement his John Hancock insurance with a $350,000 policy either from MoNY or from a second company for which he also worked. McMenimen did not disclose his relationship with either firm to the plaintiffs, instead telling them that he was an independent broker who would look for the best deal across multiple firms. Sam Sr. followed this advice, and MoNY issued him a $350,000 policy. Accordingly, by December of 1997, the Pietropaolos had met their insurance benefit goal.

---

[7]Provident Mutual, along with Nationwide Securities, LLC, and Nationwide Financial Services, Inc., will be referred to collectively as "Nationwide" or "the Nationwide Defendants."

Shortly thereafter, however, McMenimen left MoNY for a position with NEAG, reporting to Armstrong. NEAG existed solely as the corporate embodiment of Armstrong's position for Provident Mutual. NEAG generated a substantial part of its revenue from commissions on the sale of Provident Mutual policies; each employee's ability to generate these commissions factored into his or her compensation.

Almost immediately after joining NEAG in February of 1998, McMenimen advised the Pietropaolos to look for a better deal than Sam Sr. had received from MoNY. He provided the Pietropaolos with an application for a $500,000 policy with Provident Mutual, again failing to disclose his relationship with the company. By March of 1998, McMenimen had told the Pietropaolos that Sam Sr. had been approved for $500,000 of coverage at a better rate than he was getting from MoNY. McMenimen advised the Pietropaolos to cancel the policies with MoNY and John Hancock, and to use the cash surrender value of the latter policy towards payments on a new Provident Mutual policy.

In fact, Provident Mutual never approved a $500,000 policy. Provident Mutual's medical records search revealed that Sam Sr. suffered from a condition which left him ineligible for its standard rate life insurance. Without informing the Pietropaolos, and despite knowing that they had wanted $500,000 in coverage, McMenimen nevertheless told Provident Mutual to issue a $200,000 policy with a premium 250 per cent higher than the standard rate.[8]

In the process of finalizing the $200,000 policy, McMenimen submitted to Provident Mutual two separate applications for insurance as well as other documents requiring Sam Sr.'s signature. The jury heard testimony that, in his position as the office of supervisory jurisdiction for NEAG, Armstrong was under a duty to review these documents and attest to their accuracy.[9] While a Nationwide witness explained that such a duty is often discharged

[8]McMenimen testified to his belief that the plaintiffs had already cancelled their John Hancock and MoNY policies. In fact, the MoNY policy was never actually cancelled, and only expired due to nonpayment of premiums in June of 1998.

[9]We do not comment on the accuracy of the testimony offered by the plaintiffs' expert under relevant Massachusetts law.

by relying on the accuracy of information furnished by sales agents in the field, the jury heard from multiple witnesses that Sam Sr.'s application showed inconsistencies that may have warranted a closer look.[10] Nevertheless, Armstrong failed to review the application personally and did not instruct his subordinates to subject it to a higher than normal level of scrutiny. On July 5, 1998, Provident Mutual approved and issued the $200,000 policy.

The plaintiffs had ample means to discover McMenimen's fraud almost from its inception. On May 28, 1998, they received a letter from Provident Mutual informing them that the application for a $500,000 policy had been declined. Further, they received repeated, accurate policy statements, first from Provident Mutual, and later from Nationwide, reflecting the $200,000 death benefit. However, they credited McMenimen's explanations that the $200,000 figure was just a base component and that a secondary benefit in the policy would make up the difference.[11] In occasional casual conversations through 2003, McMenimen continued to assure the plaintiffs of the $500,000 in coverage.

The insurance policy was routed through an irrevocable lifetime trust managed by Passatempo, an attorney as well as a close friend and former law school classmate of Sam Jr. Notwithstanding his broad powers under the trust agreement, Passatempo testified that he understood his only role to be to ensure that the insurance company received its payments such that the policy did not lapse. Passatempo did not view it as his role to investigate the terms and quality of the insurance that formed the trust res.

In 2003, Sam Sr. received a telephone call from a Nationwide agent who had been newly assigned to handle the policy. The agent insisted that the policy provided death benefits of only

---

[10]For example, the death benefit field in the application had initially been filled out as $500,000, but had then been cancelled and amended to $200,000. This cancellation was countersigned by McMenimen only, although industry practice also required countersignature by the insured. In addition, paperwork generated by Provident's underwriting department indicated that McMenimen was not yet a properly licensed agent in Massachusetts. McMenimen was required also to submit a second application for the $200,000 policy when the first was declined because of a signature problem that may have resulted from McMenimen's attempt to forge the signatures of Sam Sr. and Passatempo.

[11]The marketing name of the policy was OptionsPlus. The plaintiffs took the word "plus" to indicate that the policy had more than one component.

$200,000. This conversation led to a series of exchanges be-
tween the Pietropaolos and McMenimen, in which McMenimen
represented the situation as a correctable administrative mistake.
When, months later, the Pietropaolos received policy statements
still reflecting a $200,000 benefit, McMenimen told them that
he was continuing to work with Nationwide and NEAG to cor-
rect the error. The Pietropaolos, however, finally began to dis-
believe McMenimen, filing this action on July 1, 2004, and
simultaneously sending a G. L. c. 93A demand letter to the
defendants.

c. *Prior proceedings.* In *McMenimen* v. *Passatempo*, 452
Mass. 178 (2008) (*Passatempo I*), we detailed the "unnecessar-
ily complicated and prolonged history" of this litigation, which
has since been compounded by McMenimen's "second improper
attempt to secure interlocutory relief" from this court. *Mc-
Menimen* v. *Passatempo*, 458 Mass. 1007, 1007, 1009 (2010)
(*Passatempo II*). We restate this history only to the extent it is
relevant to the issues presently on appeal, reserving certain
details for later discussion.

The plaintiffs' complaint included ten State and Federal
claims. By unappealed court order or by stipulation of the par-
ties, these claims were winnowed to (1) fraud; (2) negligence
and negligent misrepresentation; and (3) violations of G. L.
c. 93A.

Several years prior to trial, the defendants moved jointly for
dismissal of the plaintiffs' remaining claims on the basis that all
were time barred pursuant to G. L. c. 175, § 181. Concluding
that G. L. c. 175, § 181, was a two-year statute of repose not
subject to equitable tolling, but that the statute only protected
insurance companies, the motion judge allowed the motion as to
the Nationwide defendants but denied dismissal of the claims
against Armstrong and McMenimen. At a subsequent summary
judgment hearing, a second motion judge agreed that G. L.
c. 175, § 181, did not shield Armstrong and McMenimen.

The trial judge conducted a twelve-day jury trial on the
plaintiffs' common-law claims, but reserved the plaintiffs' G. L.
c. 93A claims. In answers to special verdict questions on the
common-law claims, the jury found that (1) McMenimen made
an intentional misrepresentation to the plaintiffs regarding the

$500,000 death benefit; (2) both McMenimen and Armstrong were negligent with regard to obtaining a $500,000 death benefit on Sam Sr.'s life; and (3) the plaintiffs themselves were contributorily negligent, but to a lesser degree than McMenimen and Armstrong.[12] The jury awarded a total of $300,000 in damages.

Finally, the judge conducted a bench trial on the plaintiffs' G. L. c. 93A claims. The judge ruled that the plaintiffs' demand letter was insufficient to place Armstrong on notice of the G. L. c. 93A claims, and that the plaintiffs had failed to show that Armstrong engaged in any unfair or deceptive conduct. As to McMenimen, the judge largely adopted the jury's factual findings, including the jury's calculation of $300,000 in actual damages. The judge further awarded treble damages and attorney's fees.

2. *Discussion.* a. *Timeliness of the plaintiffs' claims.* The defendants argue that the Legislature intended an action for rescission under G. L. c. 175, § 181, to be the sole civil remedy for victims of fraud in the sale of insurance. They contend further that the two-year period set forth in § 181 for bringing such an action constitutes a period of repose rather than one of limitation, and that this period is therefore not subject to tolling. See *Rudenauer* v. *Zafiropoulos,* 445 Mass. 353, 357-358 (2005).

In addition to disputing the defendants' characterization of § 181 as a statute of repose, the plaintiffs maintain that the remedy set forth in § 181 applies only to insurance companies and is not an exclusive remedy, and that the gravamen of their claims brings them outside the statute's coverage. Because, as we discuss below, the latter contentions are correct, we hold that the plaintiffs' common-law claims are not subject to the two-year period set forth in § 181,[13] but instead fall within the general statute of limitations for tort actions, G. L. c. 260, § 2A (§ 2A), a limitations period that is susceptible of tolling. See G. L. c. 260, § 12. We hold further that expiration of the limitation period was tolled as to the common-law claims against McMenimen, but not as to the remaining defendants.

---

[12]The jury concluded that the plaintiffs were responsible for thirty per cent of the injury caused by Armstrong's negligence and eighteen per cent of the injury caused by McMenimen's negligence.

[13]We discuss the plaintiffs' G. L. c. 93A claims separately in part 2.b, *infra.*

i. *The scope of § 181.* Section 181 forms part of a "comprehensive statutory and regulatory framework under which the insurance industry operates." *Wilkinson* v. *Citation Ins. Co.*, 447 Mass. 663, 674 (2006). The latter half of G. L. c. 175, including § 181, details a set of regulations through which the "Commonwealth [ensures] consistency and fairness in contracts of insurance." *Id.* The first two paragraphs of § 181 make it a criminal offense for insurance companies, officers and agents of insurance companies, insurance brokers, and insurance advisers to "misrepresent[] the terms of any policy of insurance" sold by them or by their competitors. The third paragraph of § 181, at issue here, provides a civil remedy to certain persons harmed by violations of the criminal provisions of the statute:

> "The insured under any policy of life or endowment insurance or the holder of any annuity or pure endowment contract who was induced to procure it by any action in violation of this section by an officer or agent of the company issuing or executing it may recover from such company all premiums paid on such policy or contract less any indebtedness to the company thereon or secured thereby and less any payments otherwise made by the company thereon, in an action brought within two years after the date of issue thereof."

G. L. c. 175, § 181, third par.

We have not previously had occasion to construe the above provision. In doing so now, we interpret the statute so as "to effectuate the intent of the Legislature in enacting it." *Global NAPs, Inc.* v. *Awiszus*, 457 Mass. 489, 496 (2010), quoting *International Org. of Masters* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 391 Mass. 811, 813 (1984). Where "the language of a statute is clear and unambiguous, it is conclusive as to the intent of the Legislature." *Global NAPs, Inc.* v. *Awiszus, supra.*

The plain text of § 181 makes clear that the statute does not provide a civil remedy against persons or entities other than an insurance company. The civil remedy provided by § 181 is limited to recovery "from such *company*" (emphasis supplied). G. L. c. 175, § 181. This phrase stands in contrast to the criminal

provisions of § 181, which explicitly extend criminal liability to an "officer or agent" of an insurer, or to an "insurance broker or insurance adviser." Where the Legislature employs terms in one part of a statute but excludes them elsewhere, we will not imply the existence of those terms where excluded. *Canton* v. *Commissioner of the Mass. Highway Dep't*, 455 Mass. 783, 789 (2010), and cases cited. Further, applying the statutory civil remedy to individual agents or employees would make little sense; there is no obvious reason to offset the insured's "indebtedness to the company" against any damages that might be paid by an insurance agent or employees of an insurer, itself an independent entity. Accordingly, we hold that § 181 does not create a civil remedy against insurance agents or employees of insurers.

This conclusion leads us to two further questions: first, whether, by not explicitly including a civil remedy against insurance agents and employees of insurance companies, the statute thereby immunizes such persons from all civil liability for fraud or misrepresentation in the sale of insurance contracts; and second, whether the remedy that the statute provides against insurance companies is exclusive of other civil remedies against such companies. We answer both questions in the negative.

Nothing in the statute speaks directly to either of the above questions. Although the statute states that a potential plaintiff "may recover . . . all premiums paid," the permissive "may" does not necessarily indicate that a plaintiff can elect to pursue a different judicial remedy. On its face, the language can also be read to indicate that a plaintiff is not required to rescind the contract, but may instead, for example, enforce the purchased policy according to its terms.

Because "the statutory language is not conclusive, we may 'turn to extrinsic sources, including the legislative history . . . for assistance in our interpretation.' "[14] *Commonwealth* v. *Deberry*, 441 Mass. 211, 215 (2004), quoting *Chandler* v. *County*

---

[14]We note that the statute contains a savings clause as to its criminal provisions but not as to its civil provisions. The savings clause appears in the first version of the proposed amendment, which dealt solely with criminal penalties. See 1934 House Doc. No. 117. Accordingly, the drafters of the savings clause could not have intended to affect the interpretation of the (then nonexistent) civil provisions.

*Comm'rs of Nantucket County*, 437 Mass. 430, 435 (2002). Prior to 1934, § 181 was purely a criminal statute, rendering misrepresentations made in the course of selling an insurance contract a misdemeanor punishable by a fine. See St. 1913, c. 474, § 2. The impetus to amend § 181 was a December, 1933, report by the Commissioner of Insurance stating that the statutory definition of fraud did not include certain then-common and misleading practices. See 1934 House Doc. No. 102, at 29-30. The report contended also that individuals violating § 181 should be subject to a potential prison sentence in addition to a fine so that the penalty for violations of § 181 would be commensurate with the other criminal sanctions in G. L. c. 175. *Id.* The civil provisions of the statute were submitted only on the third and final reading of the bill, without any surviving explanation. See 1934 House Doc. No. 1332. Nevertheless, we infer from this history that one of the Legislature's primary purposes in amending § 181 was to heighten the statute's deterrent effect.

A reading of the statute that immunizes insurance agents and employees of insurance companies from any civil liability for misrepresentations in the sale of insurance would be inconsistent with this statutory purpose of enhanced deterrence. In 1934, individuals defrauded into purchasing insurance by an insurance agent already enjoyed a long-standing right to bring suit against such an agent. *Hedden* v. *Griffin*, 136 Mass. 229 (1884) (*Hedden*). Given the Legislature's expansion of the types of misrepresentations for which agents and employees could be criminally sanctioned, the heightened criminal sanctions it imposed on them, and its approval of expanded civil liability against the companies for which they sold insurance, it seems most unlikely that the Legislature intended to change course by insulating agents from this long-established right of action.

The more complex question is whether, as to insurance companies, the remedy of rescission under § 181 is exclusive. Again, the Legislature's desire to enhance deterrence makes it doubtful that the Legislature would have intended to preempt civil remedies other than rescission against insurance companies. In 1934, however, no other equally effective common-law remedy was available.[15] Nevertheless, "other reliable guideposts, such as . . .

---

[15]Although a victim of fraud could have elected between rescission and

the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part," *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, 449 Mass. 444, 454 (2007), quoting *EMC Corp.* v. *Commissioner of Revenue*, 433 Mass. 568, 570 (2001), convince us that the statute should not be read to preempt the plaintiffs' common-law claims in this case.

We have long held that a statutory repeal of the common law will not be lightly inferred; the Legislature's "intent must be manifest." *Comey* v. *Hill*, 387 Mass. 11, 20 (1982), citing *Jennings* v. *Commonwealth*, 17 Pick. 80, 82 (1835). Accordingly, the mere adoption by the Legislature of a common-law remedy does not, without more, prevent the continued evolution of the common law. This is so even where the codification adds a period of limitation or otherwise imposes "procedural requirements on such claims." *Matsuyama* v. *Birnbaum*, 452 Mass. 1, 23 (2008). Cf. N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 50:5 at 189 (7th ed. 2008) ("statute creating a . . . method of enforcing [preexisting common-law right] regarded as cumulative rather than exclusive").

The above principles suggest that § 181 should not preempt the common-law development of alternate remedies against insurance companies that misrepresent the terms of the policies they sell. The civil remedy provided by § 181 largely codifies a common-law remedy newly emergent in the 1930s. In 1928, six years before the Legislature amended § 181, this court extended the right of rescission provided by *Hedden* to cover both insurance companies and insurance agents. See *Harwood* v. *Security Mut. Life Ins. Co.*, 263 Mass. 341, 344 345 (1928) (*Harwood*). *Harwood* dealt with misrepresentations made directly by an insurance company. Unlike § 181, therefore, neither

---

damages, *Roche* v. *Gryzmish*, 277 Mass. 575, 579 (1931), the remedy of rescission would ordinarily have resulted in a higher level of recovery. The quantum of damages was "the difference between the value of what the defendant received and what its value would be if the facts had been as represented." *Id.* at 580. Accordingly, a plaintiff seeking damages would only have obtained an abatement of premiums, accounting for the actuarial value of the insurance actually provided, rather than a complete refund of all premiums paid. Cf. K.B. Williams, Insurance Law in Massachusetts § 25 (2d ed. 1939) (discussing only common-law and statutory rescission).

*Hedden* nor *Harwood* clearly established an insurance company's vicarious liability for the misrepresentations of an insurance agent. Still, by 1934, it was foreseeable that *Harwood* would be extended to situations of vicarious liability, even where an agent's misrepresentations were motivated by his own greed. See *Ciarmataro* v. *Adams*, 275 Mass. 521, 526 (1931) ("It is settled that a master is liable for the acts of his servant done recklessly or wilfully in the course of his employment"). See also Restatement of Agency § 236 (1933) (scope of employment includes actions taken for agent's personal gain).[16]

Against this common-law background, the Legislature's 1934 decision to enact a right of rescission against insurance companies for misrepresentations made by their officers and agents ratified the common-law remedy provided by *Harwood* and anticipated the likely future application of that remedy to cases of vicarious liability. Further, by the time *Harwood* was decided the Legislature had already established a comprehensive scheme of insurance regulation. See generally *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 622-626 (1997) (discussing broad set of insurance regulatory statutes adopted between 1888 and 1907). It would be incongruous to read a statute ratifying and extending the development of new common-law remedies parallel to an existing statutory scheme of insurance regulation as preempting the further development of such remedies.

Accordingly, we conclude that neither the text, the purpose, nor the legislative history of the statute support a reading of the third paragraph of § 181 that would result in its being the sole and exclusive civil remedy against insurance companies for those who have been induced to purchase life insurance by fraud.

ii. *Nature of the action.* Having concluded that the civil provisions of § 181 do not exclude common-law remedies other than rescission, we turn to the question whether the gravamen of the plaintiffs' claims nonetheless falls within § 181 and thus requires application of the two-year limitation period.

General Laws c. 260 establishes a set of general periods of

---

[16]The idea that the self-serving and potentially criminal acts of an agent could come within the scope of the agency relationship was controversial. See Note, The Growth of Vicarious Liability for Wilful Torts Beyond the Scope of the Employment, 45 Harv. L. Rev. 342, 348-349 (1931).

limitation for actions brought in the Commonwealth's courts. Where a statute, such as § 181, establishes a specific period of limitation, the otherwise applicable general statute of limitation "must yield to the specific statute." *Grass* v. *Catamount Dev. Corp.*, 390 Mass. 551, 553 (1983). The period of limitation established by such a specific statute "only applies to actions brought pursuant to its terms." *Rita* v. *Carella*, 394 Mass. 822, 826 (1985) (*Rita*). Nonetheless, parties may not escape a specific limitation period through artful pleading. See *Hendrickson* v. *Sears*, 365 Mass. 83, 85 (1974) ("limitation statutes should apply equally to similar facts regardless of the form of proceeding").

Here, contrary to the defendants' suggestion, the plaintiffs have not merely repackaged claims more properly brought under § 181. Instead, they have made a permissible election between overlapping but "distinct remedies." See *Rita, supra* at 827. Like the plaintiffs here, the plaintiff in *Rita* pleaded facts that would have entitled him both to a remedy under a statute with a specific period of limitation, a Boston rent control ordinance, and to a remedy under G. L. c. 93A, § 9, an action governed by a general statute of limitation, G. L. c. 260, § 5. We held that, because the procedural prerequisites for filing claims under the ordinance differed from those required by G. L. c. 93A, "[t]he statute and the ordinance provide distinct remedies," and the application of the general statute of limitations to the G. L. c. 93A, claims did not conflict with the specific one-year limitation period in the ordinance. *Rita, supra.*

The plaintiffs seek not only a distinct remedy, but a remedy for a distinct harm. The provisions of the latter part of G. L. c. 175, including § 181, govern the "rights, duties and obligations of the parties" to an insurance contract. G. L. c. 175, § 193. Section 181 permits a party to such a contract to rescind the contract for fraud. The plaintiffs, however, do not seek rescission of an issued policy, nor do they otherwise seek adjudication of their "rights, duties and obligations" as "parties" to an insurance contract. Indeed, the plaintiffs concede that Sam Sr. was never insured for $500,000. They contend simply that the defendants' fraud or negligence deceived them such that they believed he was so insured.

We have recognized previously a distinction between a plain-

tiff's rights under a purported contract of insurance and his or her rights against a tortfeasor who had led the plaintiff to believe "that [an insurance agency] had accepted the business and had caused policies to be written." *Merolla* v. *Talman & Johnson Ins. Agency, Inc.*, 354 Mass. 300, 302-303 (1968). In that case, while the jury concluded that an insurance agency was not liable in contract for an unauthorized sale of a policy by an independent insurance agent, we held that it was error to take from the jury the question whether the agency might still be vicariously liable in tort. *Id.* The statutory scheme of which § 181 is a part addresses the "consistency and fairness in contracts of insurance," and regulates such contractual rights. *Wilkinson* v. *Citation Ins. Co.*, 447 Mass. 663, 674 (2006). It does not, however, address noncontractual rights. Accordingly, we conclude that the plaintiffs seek a distinct remedy from that provided by § 181.

We turn next to the "essential nature of the right" that the plaintiffs assert in order to determine the appropriate general statute of limitation. *Anawan Ins. Agency, Inc.* v. *Division of Ins.*, 459 Mass. 592, 598 (2011). The plaintiffs' common-law claims allege intentional and negligent misrepresentation. We have held consistently that such claims sound in tort, and are governed by the three-year limitation period provided by G. L. c. 260, § 2A (§ 2A). See, e.g., *Sheffer* v. *Rudnick*, 291 Mass. 205, 205 (1935). See also *Solomon* v. *Birger*, 19 Mass. App. Ct. 634, 637-638 (1985), and cases cited.

iii. *Tolling of the limitations period.* We conclude that the plaintiffs' common-law claims are timely under § 2A as to McMenimen, but not as to the other defendants. The three-year limitations period set forth in § 2A begins to run when a claim accrues.

> "[T]he general rule for tort actions is that an action accrues when the plaintiff is injured. . . . This court has developed a discovery rule to determine when the statute of limitations begins to run in circumstances where the plaintiff did not know or could not reasonably have known that he or she may have been harmed by the conduct of another. . . . Under this discovery rule, the statute of limitations starts when the plaintiff [1] discovers, or

[2] reasonably should have discovered, 'that [he] has been harmed or may have been harmed by the defendant's conduct.' " (Citations omitted.)

*Koe* v. *Mercer*, 450 Mass. 97, 101 (2007), quoting *Bowen* v. *Eli Lilly Co.*, 408 Mass. 204, 205-206 (1990).

Under the second prong of the discovery rule, "[r]easonable notice that . . . a particular act of another person may have been a cause of harm to a plaintiff creates a duty of inquiry and starts the running of the statute of limitations." *Koe* v. *Mercer*, *supra* at 102, quoting *Bowen* v. *Eli Lilly & Co.*, *supra* at 210. Here, the jury found that the plaintiffs had sufficient information to have discovered the fraud before July 1, 2001. Because the plaintiffs did not file their action until July 1, 2004, ordinarily their tort claims would be considered time barred.

Our cases, however, leaven the discovery rule where the defendant had a fiduciary relationship with the plaintiff.[17] Pursuant to G. L. c. 260, § 12:

"If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."

In *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 519 (1997), we explained that because a fiduciary owes a duty of full disclosure to his or her principal, the fiduciary's failure to disclose "constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12." See

---

[17]Despite McMenimen's contentions, the plaintiffs are not claim-precluded or otherwise estopped from asserting that McMenimen was their fiduciary for tolling purposes simply because they abandoned their affirmative claim for breach of fiduciary duty. See *Kobrin* v. *Board of Registration in Med.*, 444 Mass. 837, 843 (2005) (claim preclusion results from judgment in prior action); *Friedman* v. *Jablonski*, 371 Mass. 482, 483 (1976) (allegations relied on to toll statute of limitations need not be pleaded in complaint). Further, because the plaintiffs have maintained consistently that McMenimen owed fiduciary duties to all the plaintiffs, there is no basis to treat Sam Jr. and Passatempo as successor fiduciaries. Contrast *O'Connor* v. *Redstone*, 452 Mass. 537, 553 (2008) (limitation period began to run where offending trustee replaced by successor trustee).

*Stetson* v. *French*, 321 Mass. 195, 199 (1947) ("mere failure to reveal may be fraudulent where there is a duty to reveal"). Accordingly, where a fiduciary relationship exists, G. L. c. 260, § 12, tolls the applicable statute of limitations until the plaintiff has actual knowledge of either the harm or the fiduciary's implicit or explicit repudiation of his or her obligations. See *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 518-519.

Here, while the jury found that the plaintiffs should have known of the fraud by July 1, 2001, they found also that the plaintiffs did not have actual knowledge of the fraud until after that date. Further, the jury found that McMenimen fraudulently concealed his actions through July 1, 2001, based on evidence tending to show that McMenimen was a fiduciary of the plaintiffs.[18] Accordingly, the statute of limitations was tolled as to McMenimen through July 1, 2001.

It was error, however, to toll the statute of limitations as to Armstrong. The record is devoid of any evidence that Armstrong himself owed a fiduciary duty to the plaintiffs, or that he otherwise fraudulently concealed the underlying deceit from them. Rather, the plaintiffs rely on McMenimen's conduct to argue that the statute of limitations should be tolled as to all the defendants.

Although we have not squarely addressed the precise issue,[19] the weight of authority in other jurisdictions holds that "plaintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants."[20] *Griffin* v. *McNiff*, 744 F. Supp. 1237, 1256 n.20 (S.D.N.Y. 1990).

[18]Although McMenimen contests the propriety of the judge's jury instruction on fraudulent concealment through violation of the fiduciary duty of disclosure on estoppel grounds and as a misapplication of the relevant law, he does not challenge the sufficiency of the evidence supporting the claim that he had a fiduciary relationship with the plaintiffs. Cf. *Cleary* v. *Cleary*, 427 Mass. 286, 292-293 (1998).

[19]Our opinion in *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 522-523 (1997), tolled the statute of limitations on the twin grounds of fraudulent concealment and the adverse domination doctrine, with only passing reference to the application of the former doctrine to defendants other than the defendant actually engaging in fraudulent concealment.

[20]See, e.g., *Burns* v. *Hartford Hosp.*, 192 Conn. 451, 459 (1984); *University of Miami* v. *Bogorff*, 583 So. 2d 1000, 1004-1005 (Fla. 1991); *Smith, Miller &*

The few cases to the contrary arise either out of a demonstrated agency relationship, particularly where the agent "employed . . . deceit for the sole benefit of the defendant," see *Pashley* v. *Pacific Elec. Ry.*, 25 Cal. 2d 226, 235 (1944), or where a defendant actively conspired with a fiduciary of the plaintiff. See, e.g., *Chicago Park Dist.* v. *Kenroy, Inc.*, 78 Ill. 2d 555, 562-563 (1980) (defendant bribed city alderman where alderman was fiduciary of city and its agencies according to Illinois law).

McMenimen's employment relationship with NEAG does not, alone, support the inference of an agency relationship between McMenimen and Armstrong, notwithstanding Armstrong's control over NEAG. Further, even if a direct agency relationship between McMenimen and Armstrong could be shown for the time McMenimen was employed at NEAG, McMenimen stopped working for NEAG in 1999, more than four years before the plaintiffs brought suit. Similarly, the plaintiffs provide no reason that any agency relationship between McMenimen and Nationwide could have continued beyond 1999.[21] Thus, the exceptions to the general rule that the statute of limitations will not be tolled against a defendant based on the fraudulent concealment of a third party do not apply here. Accordingly, the plaintiffs' common-law claims against both Armstrong and the Nationwide defendants are barred by G. L. c. 260, §§ 2A and 12.[22]

However, the limitation period for violations of G. L. c. 93A is one year longer than the limitation period for common-law tort claims. Compare G. L. c. 260, § 5A (four-year statute of limitation for violations of consumer protection statutes), with

*Patch* v. *Lorentzson*, 254 Ga. 111 (1985); *Stankiewicz* v. *Estate of LaRose*, 151 Vt. 453, 455 (1989). See also *Bates* v. *Preble*, 151 U.S. 149, 163 (1894) (construing predecessor statute to G. L. c. 260, § 12); *Burns* v. *Massachusetts Inst. of Tech.*, 394 F.2d 416, 418-420 (1st Cir. 1968) (applying G. L. c. 260, § 12).

[21]The plaintiffs suggest that McMenimen may have been an agent of Nationwide. By contrast, the documentary evidence suggests that Armstrong entered into an independent contractor relationship with Provident Mutual, Nationwide's predecessor.

[22]Because we conclude that the common-law claims against Armstrong must be dismissed, and because McMenimen's liability on the common-law claims is not cumulative of his liability under G. L. c. 93A, we do not reach the plaintiffs' contention that Armstrong and McMenimen are jointly and severally liable on the common-law claims.

G. L. c. 260, § 2A (three-year statute of limitations for common-law claims in tort). Contrary to Nationwide's assertions, the mere fact that the G. L. c. 93A violations alleged would also support a common-law tort claim does not make them subject to the shorter, three-year limitation period. Cf. *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 391, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 546 U.S. 927 (2005) ("tort-like" claims under G. L. c. 151B, not "causes of action in tort"). The jury were presented with no special question as to whether the plaintiffs should have known of the fraud by July 1, 2000. The G. L. c. 93A claims against Armstrong and Nationwide have thus not been shown to be time barred.[23]

b. *G. L. c. 93A claims.* i. *Private right of action.* McMenimen argues that the Legislature intended a 1979 amendment to G. L. c. 93A, § 9 (1), to limit the types of unfair or deceptive insurance practices actionable under G. L. c. 93A to unfair insurance settlement practices. On this reading of the statute, the plaintiffs would have no right of action under G. L. c. 93A, § 9, for insurance-related violations of G. L. c. 93A, § 2.

General Laws c. 93A, § 9 (1), provides, in relevant part:

> "Any person, other than a person entitled to bring an action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder *or* any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action . . ." (emphasis supplied).

The language following the "or" was added by the 1979 amendment, and refers to a statute, G. L. c. 176D, that prohibits unfair claims practices by insurance companies. See St. 1979, c. 406, § 1. McMenimen argues that this reference to G. L. c. 176D, § 3 (9), an insurance-specific statute, implies that private plaintiffs cannot bring G. L. c. 93A, § 9, actions against insurers for unfair trade practices that fall outside the scope of G. L. c. 176D.

---

[23]The G. L. c. 93A claim against Nationwide, unlike that against Armstrong, had been dismissed before trial and was not before the trial judge. See part 1.c, *supra.*

Where "the language of a statute is clear and unambiguous, it is conclusive as to the intent of the Legislature." *Global NAPs, Inc.* v. *Awiszus*, 457 Mass. 489, 496 (2010). As we have consistently stated, the plain language of G. L. c. 93A, § 9(1), creates two "prong[s]":

> "Under the first prong of § 9 (1), a consumer who has been 'injured by another person's use or employment of any method, act or practice declared to be unlawful by' G. L. c. 93A, § 2, or 'any rule or regulation issued thereunder' may bring an action . . . . Under the second prong of the statute, a consumer 'whose rights are affected by another person violating the provisions of' G. L. c. 176D, § 3 (9), may do so."

*Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 598 599 (2010), citing *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 564-565 (2001). While those cases involved violations of the second prong of G. L. c. 93A, § 9 (1), their logic is no less applicable here, where the plaintiffs have shown a violation arising under the first prong.[24] Accordingly, G. L. c. 93A, § 9 (1), affords the plaintiffs a private right of action in this case.[25]

ii. *Quantum of damages.* The judge calculated actual damages of $300,000, and also awarded treble damages and attorney's fees. McMenimen makes two arguments with regard to the G. L. c. 93A damages award: (1) that the judge calculated damages improperly on a benefit of the bargain basis rather than a reliance basis[26]; and (2) that the judge erred in awarding treble damages to the plaintiffs. We discern no error.

---

[24]McMenimen's argument is at odds with the clear intent of the Legislature, expressed even in the title to the 1979 act amending G. L. c. 93A, § 9: to "extend[] the scope of actions arising under the consumer protection act." St. 1979, c. 406. Cf. *American Family Life Assur. Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 474 (1983), and cases cited ("although the title of an act cannot control the plain provisions of the act, it may aid construction").

[25]Contrary to McMenimen's assertions, our conclusion here does not render the second prong of G. L. c. 93A, § 9 (1), mere surplusage. The first prong only grants a right of action to persons "injured" by violations of G. L. c. 93A, § 2. See G. L. c. 93A, § 9 (1). The second prong grants a right of action to persons "whose rights are affected" by a violation of G. L. c. 176D, § 3 (9), a potentially broader class of individuals.

[26]Benefit of the bargain damages are awarded by subtracting the value of

"[T]he usual rule . . . is that the injured party receives benefit of the bargain damages." *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 425 (2005). This rule is particularly appropriate where, as here, "the person who was the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it." See *id.*, and cases cited. Conversely, neither of the exceptions to this usual rule presents itself here.[27] Thus, we conclude that the judge applied the appropriate measure of damages.

Nor did the judge err in awarding treble damages. McMenimen contends that the judge should have construed the award pursuant to G. L. c. 93A, § 9 (3), which limits recovery "with regard to any security . . . to the amount of actual damages." Unlike the Federal securities acts, the Uniform Securities Act, as enacted in Massachusetts, explicitly excludes insurance policies from the definition of a security. See G. L. c. 110A, § 401 (*k*). This definition is, in turn, referenced in the definitions section of G. L. c. 93A. See G. L. c. 93A, § 1 (*b*) (" 'Trade' and 'commerce' shall include . . . the sale . . . of . . . any security as defined in [G. L. c. 110A, § 401 (*k*)] . . ."). Because words are given a consistent meaning throughout a statute, *Hallett* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 66, 68-69 (2000), we read the word "security" in G. L. c. 93A, § 9 (3), also to exclude insurance policies.

iii. *Dismissal of claims against Armstrong.* As stated, the trial judge concluded that the plaintiffs' G. L. c. 93A demand letter

---

what the plaintiffs actually received from the value of what they would have received had the defendant's fraudulent statements been true. Reliance damages are calculated from the harm suffered by the plaintiffs from actions reasonably expected to result from reliance on the defendant's misrepresentations. See generally Restatement (Second) of Torts § 549 & comment at 108-117 (1977). In this case, unlike a benefit of the bargain calculation, a reliance calculation would adjust the plaintiffs' recovery downward to account for the lower premiums paid by the plaintiffs under the Provident Mutual policy as compared to the John Hancock and MoNY policies.

[27]We have favored reliance damages where benefit of the bargain damages would be grossly disproportionate to the harm actually suffered by a plaintiff, see *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 424-425 & n.25 (2005), or would be so speculative as to "meet serious difficulties of proof." See *Rice* v. *Price*, 340 Mass. 502, 508 (1960).

was legally insufficient as to Armstrong, a point that the plaintiffs challenge on appeal.[28] Such a demand letter must "reasonably describ[e]" the defendant's "unfair or deceptive act or practice" relied on as a basis for liability. G. L. c. 93A, § 9 (3). "Chapter 93A requires claimants to set out specifically any activities in their demand letter as to which they seek relief. Separate relief on actions not so mentioned is foreclosed as a matter of law." *Clegg* v. *Butler*, 424 Mass. 413, 423 (1997).

The demand letter here did not mention Armstrong's name and failed to identify or describe any unfair or deceptive act or practice committed by Armstrong. In such circumstances, Armstrong was "without warning that the claimant intend[ed] to invoke the heavy artillery of c. 93A," *Cassano* v. *Gogos*, 20 Mass. App. Ct. 348, 351 (1985), and the trial judge correctly dismissed the G. L. c. 93A claims against Armstrong.

c. *Miscellaneous issues.* The plaintiffs and McMenimen raise a number of additional issues, none of which requires extended discussion.

i. *Timeliness of service.* The plaintiffs filed their action on July 1, 2004, but only effected service on McMenimen on December 28, 2004, 180 days after filing their initial complaint. McMenimen argues that the plaintiffs' claims should have been dismissed for failure to effect service of process within ninety days of filing, as required by Mass. R. Civ. P. 4 (j), as appearing in 402 Mass. 1401 (1988).[29] This contention is without merit.

Our rules of civil procedure specifically provide for extensions of the time period within which to effect service. See Mass. R. Civ. P. 6 (b), 365 Mass. 747 (1974); *Commissioner of Revenue* v. *Carrigan*, 45 Mass. App. Ct. 309, 312 (1998). Where a plaintiff files a motion for enlargement before expiration of the original time period, the plaintiff need only show "good

---

[28]The plaintiffs contend that Armstrong waived this issue by failing to raise it before or during trial. The record does not support this claim.

[29]"If a service of the summons and complaint is not made upon a defendant within 90 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion." Mass. R. Civ. P. 4 (j), as appearing in 402 Mass. 1401 (1988).

faith and lack of prejudice to the adverse party."[30] J.W. Smith & H.B. Zobel, Rules Practice § 6.3 (2d ed. 2006).

Here, the plaintiffs obtained an enlargement order within ninety days of filing their action. McMenimen neither points to any basis on which the motion judge could have concluded that the plaintiffs acted in bad faith nor alleges any prejudice resulting from the delayed service of process. The motion judge did not abuse his discretion in granting the enlargement order and, because the plaintiffs effected service on McMenimen within the time allowed by that order, service was timely.

ii. *Reasonable reliance on misrepresentations.* McMenimen argues that there was insufficient evidence to support a finding of reasonable reliance, a necessary element of fraud. Noting that the final application for insurance and the policy illustration both stated the $200,000 death benefit,[31] McMenimen argues that a cursory glance at either of these documents would have made the falsity of his representations obvious.

In support of this contention, McMenimen relies on *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 438 Mass. 459, 468 (2003) (*Kuwaiti Danish*), in which we adopted the following language from the Restatement (Second) of Torts §§ 540 and 541 (1977):

> " 'The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.' . . . '[I]f a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious . . . .' "

See *Masingill* v. *EMC Corp.*, 449 Mass. 532, 541 (2007) (unreasonable for senior executive to rely on oral statements contradicted by written agreement she personally negotiated). However, in the next paragraph of *Kuwaiti Danish, supra,* we

---

[30]The more stringent standard of "good cause" applies only where a plaintiff files a motion to extend after expiration of the original ninety-day period. See *Kennedy* v. *Beth Israel Deaconess Med. Ctr., Inc.,* 73 Mass. App. Ct. 459, 465 (2009).

[31]McMenimen relies also on the policy statements received by the plaintiffs from 1998 through 2003. Because these were received after the fraud was complete, they speak to the issue of fraudulent concealment only for purposes of tolling.

expressly distinguished cases in which defendants had "tried to conceal" or otherwise "lulled [the plaintiffs' representatives] into ignoring" obvious red flags. *Id.*, and cases cited.

Here, the jury heard evidence that McMenimen had concocted an elaborate explanation why the Provident Mutual policy documents reflected a $200,000 death benefit, one which he tied to the text of those documents. Moreover, there was evidence that McMenimen failed to disclose his relationship with Provident Mutual to the plaintiffs. Further, unlike the plaintiffs in *Kuwaiti Danish*, *supra*, and *Masingill* v. *EMC Corp.*, *supra*, the plaintiffs here were not negotiating an arm's-length transaction with a party against whom they knew they had adverse pecuniary interests. Instead, they were working with a trusted family member whom they had specifically sought out for unbiased advice. Cf. Restatement (Second) of Torts, *supra* at § 543 (distinguishing reliance on representation of adverse party from reliance on representation of disinterested party). Accordingly, McMenimen's reliance on *Kuwaiti Danish* is misplaced.

iii. *Economic loss doctrine.* McMenimen argues that the plaintiffs' negligence claim is precluded under the economic loss doctrine, which provides "that purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp.* v. *Boston Edison Co.*, 415 Mass. 393, 395 (1993). This argument is wide of the mark. The economic loss doctrine derives from negligence and strict liability actions. See, e.g., *id.*, and cases cited. Even were we to assume that the doctrine could apply to damages assessed for intentional conduct, it nonetheless does not apply to "pecuniary loss incurred as a result of an actionable misrepresentation." See *Nota Constr. Corp.* v. *Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 20-21 n.1 (1998).

iv. *Quantum of the default judgment award.* NEAG did not appear in the case; after a hearing, the trial judge entered a default judgment against NEAG in the amount of $21,000, the same figure the jury had awarded against Armstrong, NEAG's owner. The plaintiffs argue that the judge erred in awarding only $21,000 against NEAG without making any findings of fact as to the harm caused by NEAG.

We have said recently that a judge must make "some factual

findings" in support of a default judgment where damages are to be determined for a sum uncertain. *Hermanson* v. *Szafarowicz*, 457 Mass. 39, 49 (2010). Here, the judge held a hearing prior to the entry of default judgment. By that point, the trial had concluded and the judge had already made specific, written findings of fact as to NEAG's involvement in McMenimen's fraud in the course of her G. L. c. 93A decision. In such circumstances, simple adoption of the G. L. c. 93A findings would suffice. Cf. *id.* at 49-50 n.14 ("extent and nature of [any required] findings will depend on the circumstances"). Because the plaintiffs have not provided a record of the default judgment hearing for review, and we cannot ascertain what occurred at that hearing, including whether the judge made any oral findings or otherwise referenced her G. L. c. 93A findings, we deem the issue waived and do not consider it further. See Mass. R. A. P. 8 (b) (1), as amended, 430 Mass. 1601 (1999); *Commonwealth* v. *Woods*, 419 Mass. 366, 371 (1995).

3. *Attorney's fees.* Both parties contest the fees awarded by the trial judge.[32] However, the plaintiffs, as appellants, and McMenimen, as cross appellant, have both failed to include in the record on appeal the evidentiary submissions in support of the original fee petition. Again, therefore, we treat the issue as waived.[33] See Mass. R. A. P. 8 (b) (1). See also *Commonwealth* v. *Woods, supra* at 371.

We do, however, address the plaintiffs' argument that the judge erred in rejecting a supplemental motion for fees for time spent preparing the petition for attorney's fees and responding to McMenimen's opposition to the fee award; and acting to

[32]General Laws c. 93A permits prevailing plaintiffs to recover reasonable attorney's fees. See *Linthicum* v. *Archambault*, 379 Mass. 381, 388 (1979). Based on his erroneous belief that insurance policies are securities for the purposes of G. L. c. 93A, § 9 (3), McMenimen contends that the plaintiffs are not entitled to any attorney's fees. This argument is without merit. See part 2.b.ii, *supra.*

[33]Without a copy of the billing records and supporting affidavits submitted by the plaintiffs' attorneys, we cannot evaluate McMenimen's contention that there was insufficient support for the hourly rate approved by the judge, or that the records reflected "block billing," attorney time spent on clerical tasks, and overstaffing of simple tasks. Nor can we determine whether these submissions were sufficient to support the adjustment the judge made to account for time spent on matters not subject to fee shifting.

enforce a Superior Court judge's order that McMenimen's assets be frozen prior to entry of judgment, which is now the subject of a pending complaint for contempt.[34] As to the first argument, the plaintiffs point to no consideration that would have prevented them from including the time spent preparing the petition for fees and contesting McMenimen's opposition in their initial or reply motions to the first fee award. As to the second argument, the plaintiffs' proper remedy is to pursue the contempt proceeding, and to petition the trial judge for attendant fees. See *Police Comm'r of Boston* v. *Gows*, 429 Mass. 14, 17 (1999) ("Where a party's conduct in a litigation constitutes contempt of court, however, a court has discretion to award attorney's fees against the contumacious party"). Accordingly, the judge did not err in denying the plaintiffs' supplemental fee request.

4. *Conclusion.* For the foregoing reasons, we affirm the judgment and the award of damages, punitive damages, and attorney's fees against Frederick V. McMenimen, III, and affirm the default judgment against New England Advisory Group, LLC. We reverse the judgment on the negligence claim against Barry G. Armstrong, and affirm the dismissal of the G. L. c. 93A claim against him. As to the Nationwide defendants, we reverse the judgment dismissing the G. L. c. 93A claims against them, and affirm the judgments on all other claims. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[34]The plaintiffs obtained an injunction preventing McMenimen from transferring certain of his assets. The plaintiffs claim that McMenimen has made transfers in violation of this injunction, and has attempted to avoid enforcement of the injunction through frivolous motions.